# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
### November 4, 2015 Session

## STATE OF TENNESSEE v. JIMMY DALE QUALLS

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Hardeman County**
**No. 2010-CR-88     J. Weber McCraw, Judge**

_____

**No. W2013-01440-SC-R11-CD – Filed January 28, 2016**
_____

The dispositive issue in this appeal is whether the election of offenses doctrine, articulated in Burlison v. State, 501 S.W.2d 801 (Tenn. 1973), and reaffirmed in State v. Shelton, 851 S.W.2d 134 (Tenn. 1993), requires the prosecution to identify a single incident of sexual battery in cases, such as this one, where the child victim testifies to repeated incidents of sexual contact occurring over a substantial period of time but does not furnish any specific details, dates, or distinguishing characteristics as to individual incidents of sexual battery. We hold, as have courts in other jurisdictions, that where a prosecution is based on such nonspecific or "generic" evidence, requiring the prosecution to elect a single specific incident is not possible. However, to prevent infringement upon the defendant's right to a unanimous verdict, the trial court must give a modified unanimity instruction which informs the jury that it must unanimously agree the defendant committed all the acts described by the victim in order to convict the defendant. Although the trial court did not have the benefit of this decision and therefore did not provide the modified unanimity instruction to the jury in this case, we conclude, based on the record in this appeal, that the omission of this instruction was harmless beyond a reasonable doubt. Accordingly, we reverse the Court of Criminal Appeals' judgment vacating the defendant's convictions of sexual battery by an authority figure and reinstate the trial court's judgment approving the jury's verdict.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Vacated; Judgment of the Trial Court Reinstated**

CORNELIA A. CLARK, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and JEFFREY S. BIVINS and HOLLY KIRBY, JJ., joined.

Herbert H. Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Rachel E. Willis, Lead Senior Counsel; James E. Gaylord, Senior Counsel; Mike Dunavant, District Attorney General; Joe Van Dyke and Katie Walsh, Assistant District Attorneys General, for the appellant, State of Tennessee.

Andrea Sipes Lester (on appeal), Jackson, Tennessee, and David A. Stowers (at trial), Bolivar, Tennessee, for the appellee, Jimmy Dale Qualls.

**OPINION**

**I. Factual and Procedural Background**

In May 2010, the Hardeman County Grand Jury indicted Jimmy Dale Qualls ("the defendant") for thirty-seven counts of sexual battery by an authority figure,[1] a Class C felony, and one count of incest.[2] The alleged victims of the sexual battery charges were the defendant's daughters, E.K.Q. and E.Q.[3] The alleged victim of the incest charge was J.S., the defendant's adopted daughter, whom he married in 1995. J.S. is the mother of E.K.Q. and E.Q.[4]

---

[1] As pertinent to this appeal, sexual battery by an authority figure is defined as "unlawful sexual contact with a victim by the defendant" if "[t]he victim was, at the time of the offense, thirteen (13) years of age or older but less then eighteen (18) years of age" and "[t]he defendant had, at the time of the offense, parental or custodial authority over the victim and used the authority to accomplish the sexual contact." Tenn. Code Ann. § 39-13-527(a) (2014). Additionally, "[s]exual contact" includes "the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification . . . ." Tenn. Code Ann. § 39-13-501(6) (2014). The text of the statutes currently in effect is the same as that of the statutes in effect at the time of the proceedings in the trial court; thus, quotations and citations in this opinion are to the current statutes.

[2] As relevant to the defendant's conviction, incest is defined as "engag[ing] in sexual penetration . . . with a person, knowing the person to be, without regard to legitimacy: (1) The person's . . . adoptive child . . . ." Tenn. Code Ann. § 39-15-302(a) (2014).

[3] While the victims are now of majority age, they were minors when these charges arose, and "[i]t is the policy of this Court to identify minors in a way that protects their privacy." State v. Frausto, 463 S.W.3d 469, 474 n.3 (Tenn. 2015).

[4] The defendant adopted J.S. while he was married to her mother. The defendant began having sexual intercourse with J.S. when she was thirteen, and they married in 1995. See State v. Qualls, No. W2010-02523-CCA-R3-CD, 2012 WL 939001, at *1 (Tenn. Crim. App. March 14, 2012). The defendant and J.S. divorced prior to his second trial, from which this appeal arises. The defendant's conviction for incest in the first trial was affirmed on appeal and that count was not retried.

At an initial trial on the May 2010 indictments, the jury convicted the defendant of all charges. The defendant appealed, contending that the State had failed to make an election of offenses. Qualls, 2012 WL 939001, at *1. The State conceded that it had erroneously failed to make an election of offenses for the sexual battery by an authority figure charges and that this failure constituted reversible error. Id. The Court of Criminal Appeals, therefore, affirmed the defendant's conviction for incest but reversed his convictions of sexual battery by an authority figure and remanded for a new trial of those charges. Id.

On January 8, 2013, the defendant was retried on thirty-seven counts of sexual battery by an authority figure. The State called three witnesses: E.K.Q., E.Q., and their mother, J.S.

E.K.Q., the oldest daughter, was born on September 1, 1989, and was seventeen when the sexual battery occurred. She lived with her parents and siblings throughout the duration of the touching, which began in January 2007, when she was a senior in high school, and ended in August 2007, when E.K.Q. turned eighteen. E.K.Q. said the defendant, using slang terms for the vaginal area, "would say things like, 'Let me pinch your p----'" frequently, and when she and her younger sister, E.Q., got new bras, he would "feel the bras to make sure they fit correctly." She testified that the defendant would come up behind her and E.Q. and use his finger to "fiddle" with their "butt crack[s]" and would grab her or E.Q.'s vagina, but "would laugh about it," as if it were a joke. At trial, E.K.Q. stood and demonstrated the defendant's action. E.K.Q. explained the defendant "would tell [them] that it was okay for him to do it [because] he was teaching [the victims] what to not let other people do." E.K.Q. also said that the defendant used the bathroom when she and E.Q. showered and remained in the bathroom, watching them as they dried off, again stating that his being there was acceptable because he was their father.

E.K.Q. explained that she followed the defendant's instructions because he kept a "whooping" stick and had previously choked, punched, and "stomped" her when she had disobeyed him. When asked why her mother had not stopped the defendant from staying in the bathroom while she and her sister showered, E.K.Q. explained that when her mother had previously tried to stop the defendant, he had choked, slapped, and kicked her mother. E.K.Q. left the family home in May 2009 and moved in with her maternal aunt[5] in Arkansas. E.K.Q. told her aunt about the abuse, and her aunt encouraged E.K.Q. to report it to the police.

---

[5] While E.K.Q. and E.Q. both refer to this woman as their "sister," the record indicates this woman is their mother's sister. They presumably refer to their aunt as their sister because the defendant had legally adopted her at the same time he adopted their mother.

When asked what type of sexual abuse occurred most frequently, E.K.Q. replied, "It would be, like, butt grabbing or the fiddling—I mean, it all kind of was altogether—and the pinching the p----." She agreed the "butt grabbing" and fondling of the vaginal area were "done in concert with each other." During her direct examination, E.K.Q. answered in the affirmative when asked if the defendant fondled her in that manner once each month:

> [State]: So, [E.K.Q.], we're talking about—we've previously talked about all the different types of sexual contact that your father had with you; right?
>
> [E.K.Q.]: Yes, ma'am.
>
> [State]: And I'm trying to get to the specific—specific instances that it happened and what month they happened in so I'm going to be as specific as I can so if I'm asking a confusing question, feel free to ask me to rephrase it.
>
> [E.K.Q.]: Yes, ma'am.
>
> [State]: Between January 1, 2007, and January 30, 2007, did your father, [the defendant], fondle your buttocks and vagina at your home in Hardeman County, Tennessee?
>
> [E.K.Q.]: Yes, ma'am.
>
> [State]: And between February 1, 2007, and February 27, 2007, did your father, [the defendant], fondle your buttocks and vagina at your house in Hardeman County, Tennessee?
>
> [E.K.Q.]: Yes, ma'am.

By the close of her testimony, E.K.Q. had answered in the affirmative that the defendant had engaged in this conduct—fondling her buttocks and vagina—between January 1, 2007 and January 30, 2007, between February 1, 2007 and February 27, 2007, between March 1, 2007 and March 30, 2007, between April 1, 2007 and April 29, 2007, between May 1, 2007 and May 30, 2007, between June 1, 2007 and June 29, 2007, between July 1, 2007 and July 30, 2007, and between August 1, 2007 and August 31, 2007. E.K.Q. said the fondling occurred inside their home and in the presence of family members.

E.Q. testified that the defendant touched her from January 2007 to May 2009, beginning when she was thirteen and ending when she was fifteen and these criminal charges were brought against him. Expanding on E.K.Q.'s testimony, E.Q. stated the defendant would watch her and E.K.Q. as they undressed to shower and dressed again afterwards. E.Q. said that she did not attempt to cover herself with a towel, because if she had, she said the defendant would "call [her] out on it and it would just be all bad after that." E.Q. said she had to "play along with it, pretend like [she was] okay with it, try to just shut it out of [her] mind that he was even there and just hurry up to get dressed as fast as [she could] . . . ." E.Q. also expounded on E.K.Q.'s testimony regarding the bras, stating they were required to "model" new bras and underwear for the defendant and that he would feel their breasts to "make sure the bra fit . . . ."

E.Q. testified that the defendant began asking her if he could "pinch" her "p----" in January 2007, when she was in eighth grade. The defendant would touch her "so far low" on her buttocks that he would touch her vagina over her clothes. To clarify that the defendant's touching was one motion, the State asked:

[State]: How did it make you feel when your dad would— You said he would touch your buttocks and reach his hand up—

[E.Q.]: Um-hmmm.

[State]: —and touch you where?

[E.Q.]: Like, I mean, it would be over the clothes but he would grab our butt[s] and it would be so far low that, I mean, he was pretty much right there at our vaginas, pretty much.

[State]: So he would reach behind and—

[E.Q.]: Um-hmmm.

[State]: —touch your bottom—

[E.Q.]: Yes.

[State]: —and reach up to your vagina?

[E.Q.]: Um-hmmm.

E.Q. confirmed that the defendant stated his actions (touching her and asking if he could "pinch" her "p----") were appropriate because he was her father. When the defendant touched her, E.Q. explained that she would "immediately jerk[] back but [she] couldn't express that it was uncomfortable" because then the defendant's reaction "would be horrible." E.Q. said she would have been beaten had she acknowledged disliking the touching. She testified that the defendant would fondle her and E.K.Q. in the presence of others, stating:

> I mean, he would [fondle our buttocks and vaginal areas] right in front of everybody. I mean, we'd sit at the kitchen table, my mom, dad drinking coffee, everyone, bend over to get something out of a drawer, he would do it to my sister, [E.K.Q.]. I mean, he never hid it from anyone in the house.

E.Q. testified that this touching occurred weekly for nearly two-and-a-half years, until she moved out to live with her aunt in May 2009 and reported the defendant's conduct. Like her sister, E.Q. was asked whether the touching occurred each month, and she testified as follows:

[State]: You told different things that he would do. I'd like to elect to discuss the way that he would fondle or he would take his hand and touch your buttocks and reach up then to touch your vagina.

[E.Q.]: Yeah.

[State]: And between the dates of January 1, 2007, and January 30, 2007, did your father, [the defendant], fondle your buttocks and your vagina, even though it was over your clothing—

[E.Q.]: Um-hmmm.

[State]: —while at your house in Hornsby?

[E.Q.]: Yes.

[State]: Between February 1, 2007, and February 27, 2007, did your father, [the defendant], fondle your buttocks and vagina while at your house in Hornsby?

[E.Q.]: Yes.

Ultimately, E.Q. replied in the affirmative that the defendant had touched her buttocks and vaginal area over her clothes once between January 1, 2007 and January 30, 2007, between February 1, 2007 and February 27, 2007, between March 1, 2007 and March 30, 2007, between April 1, 2007 and April 29, 2007, between May 1, 2007 and May 30, 2007, between June 1, 2007 and June 29, 2007, between July 1, 2007 and July 30, 2007, between August 1, 2007 and August 30, 2007, between September 1, 2007 and September 29, 2007, between October 1, 2007 and October 30, 2007, between November 1, 2007 and November 29, 2007, between December 1, 2007 and December 30, 2007, between January 1, 2008 and January 30, 2008, between February 1, 2008 and February 27, 2008, between March 1, 2008 and March 30, 2008, between April 1, 2008 and April 29, 2008, between May 1, 2008 and May 30, 2008, between June 1, 2008 and June 29, 2008, between July 1, 2008 and July 30, 2008, between August 1, 2008 and August 30, 2008, between September 1, 2008 and September 29, 2008, between October 1, 2008 and October 30, 2008, between November 1, 2008 and November 29, 2008, between December 1, 2008 and December 30, 2008, January 1, 2009 and January 30, 2009, between February 1, 2009 and February 27, 2009, between March 1, 2009 and March 30, 2009, between April 1, 2009 and April 29, 2009, and between May 1, 2009 and May 30, 2009.

When called to the stand, J.S., the victims' mother, corroborated the victims' testimony regarding the defendant's touching them between January 2007 and May 2009. On cross-examination, she admitted the defendant was very strict with the victims, but on redirect, she stated that the victims moved out to live with their aunt to escape the defendant's touching, not his strict rules.

With this, the State rested its case-in-chief, and during the ensuing recess, the parties discussed jury instructions. The defendant elected not to testify and did not present additional proof. The State sought to cure its failure to elect in the previous trial by electing a specific type of abuse, limited to one incident per month—the defendant's fondling of each victim's buttocks and vagina. In its closing argument, the State reminded the jury:

> Now, the girls told you several things that daddy did over time. We made sure that we were very specific and that we elected one type of offense. The offense that we elected to prove occurred was *his fondling their buttocks and their vagina[s]*. The (inaudible) in the case we called out in the indictment. And we went through every one of them on both of those girls. And in those (inaudible), both of those girls were touched in their intimate parts or the clothing covering their intimate parts. Now, they told you they had their clothes when he did it but he was still touching their buttocks and their vagina[s]. It wasn't after the game, "good game." No. He was reaching down there and getting a little feel. That's what they told you.

(Emphasis added.) Before the jury retired to deliberate, the trial court gave the following jury instructions:

> To [e]nsure a unanimous verdict the law requires the State to elect which alleged act testified to the State[,] and which the State is relying upon for your consideration[,] in deciding whether or not the defendant is guilty of this offense or any lesser included offense. The fact that the Court has required the State to make such an election does not mean that the Court has found that the State has carried its burden of proof in these allegations beyond a reasonable doubt. That is for your determination. In this case, the State has elected to submit for your consideration the alleged act of sexual battery by an authority figure and that will be on each of the thirty-seven counts, that these occurred at the defendant's home either in Hardeman County or in Hornsby, I think was the testimony, and then the State was required to go through and make an election on the date. So in Count One that date would be between January 1, 2007, and January 30, with the allegation that the defendant fondled [E.K.Q.'s] vagina and buttock[s], and that's in Count One. The difference in Count Two would be the election date. That would be between February 1, 2007, through February 27, 2007, and that's with regard to Count Two. With regard to Count Three, the State makes the same election with the difference being the event date, the allegation between March 1, 2007, and March 30, 2007. Again, that's for Count Three.

The court gave similar instructions for counts four through eight with respect to E.K.Q., and for counts nine through thirty-seven with respect to E.Q. Based on the evidence and instructions, the jury convicted the defendant of thirty-seven counts of sexual battery by an authority figure, and the trial court sentenced the defendant to an effective thirty-five year sentence at thirty percent.[6] The defendant moved for a new trial, challenging, as relevant to this appeal, the sufficiency of the evidence to support the convictions and the sufficiency of the State's election. The trial court denied the defendant's motion, and the defendant appealed.[7]

---

[6] The trial court sentenced the defendant as a Range I offender to five years at thirty percent on each count of sexual battery by an authority figure. The trial court ordered concurrent service of counts one through six, counts seven through eight, counts nine through fourteen, counts fifteen through twenty, counts twenty-one through twenty-six, counts twenty-seven through thirty-two, and counts thirty-three through thirty-seven, for a total effective sentence of thirty-five years. The trial court ordered these sentences served consecutively to the four-year sentence the defendant had received on the incest conviction.

[7] The order denying the motion is not included in the record on appeal, but neither party has raised any concerns regarding its absence.

Before the Court of Criminal Appeals, the defendant contended that the State had failed "to elect properly the conduct for which it sought convictions" and that the evidence was not sufficient to support his conviction. See State v. Qualls, No. W2013-01440-CCA-R3-CD, 2014 WL 4072098, at *5 (Tenn. Crim. App. Aug. 18, 2014). The Court of Criminal Appeals once again held that the State had failed to make a proper election of offenses, but the intermediate appellate court found the evidence sufficient to support the convictions. Id. at *10-11. The Court of Criminal Appeals explained:

> [T]he election was inadequate. The victims provided general testimony regarding the Defendant's touching their buttocks and vaginal area during the specified time frames in the indictment but failed to provide particularity in order for the jury to have rendered discrete verdicts for each of the thirty-seven counts. The fact that the testimony was general does not relieve the State of the obligation to make a proper election.

Id. at *10 (internal citations omitted). Accordingly, the Court of Criminal Appeals reversed the convictions and remanded for a new trial.

Thereafter, the State of Tennessee filed an application for permission to appeal, which we granted. See Tenn. R. App. P. 11.

## II. Analysis

### A. Standard of Review

Neither the State nor the defendant discusses the standard of review that applies when this Court reviews the propriety of the State's election of offenses. Here, unlike earlier cases, see, e.g., State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015), the issue was properly preserved in the courts below. We hold that when it is properly preserved, the issue of whether the election requirement has been satisfied is a question of law, to which de novo review applies. See State v. Clark, 452 S.W.3d 268, 295 (Tenn. 2014) ("Whether jury instructions are sufficient is a question of law [that] appellate courts review de novo with no presumption of correctness.") (citing State v. Hawkins, 406 S.W.3d 121, 128 (Tenn. 2013); Nye v. Bayer Cropscience, Inc., 347 S.W.3d 686, 699 (Tenn. 2011)).

### B. Election Doctrine

Article I, section 6 of the Tennessee Constitution provides "[t]hat the right of trial by jury shall remain inviolate, and no religious or political test shall ever be required as a qualification for jurors." Tenn. Const. art. I, § 6. This state constitutional provision has been interpreted as guaranteeing the right to trial by a jury of twelve persons in all criminal cases "where a fine of more than $50.00 or any confinement of the accused may

be imposed." State v. Dusina, 764 S.W.2d 766, 768 (Tenn. 1989); see also Grooms v. State, 426 S.W.2d 176, 176-77 (Tenn. 1968); Willard v. State, 130 S.W.2d 99, 100 (Tenn. 1939). This constitutional provision also guarantees every accused the right to a unanimous jury verdict before a conviction for a criminal offense may be imposed. State v. Lemacks, 996 S.W.2d 166, 169-70 (Tenn. 1999); see also State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993) ("Although the federal constitution's requirement of unanimity among jurors has not been imposed on the states through the Fourteenth Amendment, there should be no question that the unanimity of twelve jurors is required in criminal cases under our state constitution." (quoting State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991) [hereinafter Brown I] (internal quotation marks omitted))). Therefore, before a verdict of conviction may be rendered, jurors must unanimously agree on the particular criminal act the defendant committed.

In most criminal trials, the constitutional guarantee of juror unanimity is readily satisfied. This is true because it is a general rule that evidence the defendant has committed "some other crime wholly independent of that for which he is charged, even though it is a crime of the same character" is generally excluded as "irrelevant." State v. Rickman, 876 S.W.2d 824, 827 (Tenn. 1994) (quoting Bunch v. State, 605 S.W.2d 227, 229 (Tenn. 1980)) (internal quotation marks omitted); see also Tenn. R. Evid. 404(a) & (b). However, this general prohibition has been relaxed in the sex crimes context, specifically in cases where the defendant is alleged to have committed sexual offenses over a lengthy period of time against young children who are often unable to identify the dates on which particular acts were perpetrated. State v. Johnson, 53 S.W.3d 628, 631 (Tenn. 2001); Rickman, 876 S.W.2d at 828; Shelton, 851 S.W.2d at 137. Therefore, "where the indictment charges that sex crimes occurred over a span of time," rather than on specific dates, then "evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible." Rickman, 876 S.W.2d at 828 (citing Shelton, 851 S.W.2d at 137; State v. Brown, 762 S.W.2d 135, 137 (Tenn. 1988) [hereinafter Brown II]).

Relaxation of the general prohibition on the admissibility of prior acts evidence created the potential for a non-unanimous jury verdict because "each unlawful act of carnal knowledge is a separate, substantive offense, rather than a continuous offense." Shelton, 851 S.W.2d at 137 (quoting Jamison v. State, 94 S.W. 675, 676 (Tenn. 1906)) (internal quotation marks omitted); see also State v. Anderson, 748 S.W.2d 201, 203 (Tenn. Crim. App. 1985) (treating allegations of sexual battery as separate offenses for the purposes of election), overruled on other grounds by Shelton, 851 S.W.2d at 138. The election of offenses doctrine developed to eliminate this potential. Shelton, 851 S.W.2d at 136-37. The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt. Rickman, 876 S.W.2d at 828 (citing Shelton, 851 S.W. 2d at 137); see also Knowles, 470 S.W.3d at 423-24. The election must be made at the conclusion of the State's case-in-

- 10 -

chief.  Rickman, 876 S.W.2d at 828.  The election requirement "augment[s] the general unanimity instruction" and serves to ensure that the jury understands its obligation to agree unanimously that the defendant committed the same criminal act before it may convict the defendant of a criminal offense.  Lemacks, 996 S.W.2d at 170 (quoting Brown I, 823 S.W.2d at 583) (internal quotation marks omitted).  Were the State permitted to present proof of many criminal acts that all allegedly occurred within the time period covered by the charging instrument, but not required to make an election of offenses, juror unanimity would be compromised because nothing would prevent jurors from "reach[ing] into the brimming bag of offenses and pull[ing] out one for each count." Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996) (describing the "'grab-bag' theory of justice").

The election doctrine also assists the defendant in preparing for and defending against the specific charge, protects the defendant from double-jeopardy concerns, "enables the trial judge to review the weight of evidence in its role as thirteenth juror[, and] enables an appellate court to review the legal sufficiency of the evidence."  State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999) [hereinafter Brown III] (citing Tidwell, 922 S.W.2d at 500-01; Burlison v. State, 501 S.W.2d 801, 803 (Tenn. 1973)).  Nevertheless, as this Court has previously emphasized, the most important purpose served by the election of offenses doctrine is to "ensure that the jurors deliberate over and render a verdict based on the same offense . . . ."  Id.; see also, e.g., Shelton, 851 S.W.2d at 137 (stating that "the most serious concern" the election doctrine addresses is "the well-established right under our state constitution to a unanimous jury verdict before a criminal conviction is imposed").[8]

### C.  Means of Making an Election

Despite its importance to ensuring unanimity, applying the election doctrine in child sexual abuse cases presents practical difficulties.  As a result, this Court has not insisted upon a single means of making an election and has instead allowed "the State some latitude in the prosecution of criminal acts committed against young children who are frequently unable to identify a specific date on which a particular offense was committed."  Rickman, 876 S.W.2d at 828 (citing Shelton, 851 S.W.2d at 137); see also Brown III, 992 S.W.2d at 391 ("We are sensitive to the fact that young children who are victims of child abuse may not be able to testify that abuse occurred on a specific date, or

---

[8] We have previously acknowledged that insofar as aiding the defendant in preparing a defense, an election at the close of the prosecution's case-in-chief is much less effective than the defendant "requesting a bill of particulars before trial, pursuant to Tenn. R. Crim. P. 7(c)."  Shelton, 851 S.W.2d at 137 (citing State v. Hicks, 666 S.W.2d 54 (Tenn. 1984)).  We have also recognized that an election provides only duplicative double jeopardy protection because the accused is already protected against double jeopardy for all the offenses "charged during the entire period of time covered in the indictment." Id. (citing State v. Hardin, 691 S.W.2d 578, 580-81 (Tenn. Crim. App. 1985)).

provide extensive details in this regard."). "[T]he election requirement is merely a means by which to protect the right to a unanimous verdict. There is no right to a perfect election, and indeed, as this Court has recognized, the election requirement may be satisfied in a variety of ways." Knowles, 470 S.W.3d at 424.

For example, the State may elect a particular offense by "narrow[ing] the multiple incidents by asking the victim to relate any of the incidents to a specific month," State v. Walton, 958 S.W.2d 724, 727 (Tenn. 1997), "identify[ing] a particular type of abuse and elect[ing] that offense[,]. . . [or] identify[ing] an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit," Shelton, 851 S.W.2d at 138.

We also have affirmed an election that identified the offense for which the prosecution sought conviction as the assault that occurred the night before the victim's first menstrual period, even though that night "could have occurred on any date during that year." State v. Herron, 2014 WL 217722, *10 (Tenn. Crim. App. Jan. 17, 2014), discussion on election aff'd by State v. Herron, 461 S.W.3d 890, 904 (Tenn. 2015). Specifying the type of abuse and identifying the sexual assault as occurring "on a Friday when it was warm," Brown III, 992 S.W.2d at 392, or "while [the victim] was out of school on Christmas break," Tidwell, 922 S.W.2d at 499, have similarly been upheld as sufficiently specific elections.

All of this Court's prior decisions addressing the election doctrine have involved cases where child victims provided specific testimony about the charged criminal acts and identified in some manner when those acts were perpetrated. Thus, those decisions have mandated the prosecution to elect the specific act or incident for which it seeks conviction. See Tidwell, 922 S.W.2d at 500-02; Rickman, 876 S.W.2d at 828; Shelton, 851 S.W.2d at 137-38. In addition, the jury receives a unanimity instruction,[9] which

_____

[9] The pattern unanimity jury instruction provides:

The [S]tate has offered proof in its case[-]in[-]chief of more than one act allegedly committed [by the defendant][by one for whom the [S]tate alleges the defendant is criminally responsible] which the [S]tate alleges constitutes an element of (continued . . .)

the offense of _____ as charged in Count _____ of the indictment. To ensure a unanimous verdict, the law requires the [S]tate to elect which alleged act testified to the [S]tate is relying upon for your consideration in deciding whether or not the defendant is guilty of this offense [or any lesser included offense]. The fact that the court has required the [S]tate to elect does not mean that the court has found that the [S]tate has carried its burden of proving those allegations beyond a reasonable doubt; that is for your determination. In this case, the [S]tate has elected to submit for your consideration the alleged act of _____ [occurring on _____ ][occurring at _____ ][when _____ ]. Members of the jury, you are to consider only this

- 12 -

supplements the election requirement but does not substitute for it. Lemacks, 996 S.W.2d at 170.

We have not previously addressed, however, how to deal with a case involving testimony concerning the commission of multiple instances of a similar type of abuse where the witnesses cannot or do not specifically differentiate the events, and there are fewer counts in the indictment than there is testimony about the abuse. In such cases children may have been subjected to abuse on a daily basis over an extended time, amounting to literally hundreds of offenses. It is often not feasible for prosecutors to charge every single one of those acts in separate counts. The more counts that are charged, the more difficult it becomes to differentiate them. This case, sadly, presents us with the opportunity to discuss this more complicated fact situation.

### D. *Generic Evidence*

In this case the victims described with clarity the type of sexual battery perpetrated on them but failed to identify specifically when each alleged act occurred. Instead, the victims here described a pattern of abuse that occurred over an extended period of time. One of the victims testified that the act of sexual battery occurred once a week. Both victims testified that the abuse occurred regularly and happened at least once during the time periods charged in each count of the indictment.

Courts in other jurisdictions have termed this type of testimony "generic evidence." See R.L.G., Jr. v. State, 712 So. 2d 348, 356 (Ala. Crim. App. 1997), aff'd, 712 So. 2d 372 (Ala. 1998); see also, e.g., Baker v. State, 948 N.E.2d 1169, 1174 (Ind. 2011) ("The victim's 'generic testimony' may describe a pattern of abuse ('every time mama went to the store') rather than specific incidents ('after the July 4th parade').").

As the California Supreme Court recognized, generic evidence is often the only proof available in some of the most egregious child sexual abuse cases, which involve resident molesters who abuse their victims for years:

> Child molestation cases frequently involve difficult, even paradoxical, proof problems. A young victim . . . assertedly molested over a substantial period by a parent or other adult residing in his home, may have no practical way of recollecting, reconstructing, distinguishing or identifying by 'specific incidents or dates' all or even any such incidents. []Indeed,

---

(continued . . . )

alleged act in deciding whether or not the defendant has been proven guilty beyond a reasonable doubt of the offenses charged and included in Count _____.

7 Tenn. Prac. Pattern Jury Instr. T.P.I.—Crim. 42.25 (updated Sept. 2015).

even a mature victim might understandably be hard pressed to separate particular incidents of repetitive molestations by time, place or circumstance.

People v. Jones, 792 P.2d 643, 648 (Cal. 1990), as modified (Aug. 15, 1990) (internal citations omitted); see also R.L.G., Jr., 712 So. 2d at 356 ("[A]n abuser residing with the child . . . could perpetuate the abuse so frequently and in so many locations that the young child loses any frame of reference in which to compartmentalize the abuse into 'distinct and separate transactions.'"); State v. Brown, 780 P.2d 880, 885 (Wash. Ct. App. 1989) [hereinafter Brown IV] ("The more frequent and repetitive the abuse, the more likely it becomes that the victim will be unable to recall specific dates and places. . . . [T]he state's case [often] rests on the testimony of a victim whose memory may be clouded by a blur of abuse and a desire to forget.").

To address this unusual situation, other states have adopted the either/or approach to election. See Johnson, 53 S.W.3d at 635. Under this approach, the prosecution may choose either to make an election at the close of its proof-in-chief or to have the jury instructed that it cannot render a guilty verdict unless it unanimously agrees upon the specific act or acts that constitute the crime. See, e.g., Jones, 792 P.2d at 659;[10] State v. Petrich, 683 P.2d 173, 178 (Wash. 1984), overruled on other grounds by State v. Kitchen, 756 P.2d 105 (Wash. 1988).[11]

---

[10] In pertinent part, the current California jury instruction states:

In order to find the defendant guilty, it is necessary for the prosecution to prove beyond a reasonable doubt the commission of [a specific act [or acts] constituting that crime] [all of the acts described by the alleged victim] within the period alleged.

And, in order to find the defendant guilty, you must unanimously agree upon the commission of [the same specific act [or acts] constituting the crime] [all of the acts described by the alleged victim] within the period alleged.

Cal. Jury Instruction Crim. 4.71.5.

[11] Washington's either/or approach allows the State,

in its discretion, [to] elect the act upon which it will rely for conviction. Alternatively, if the jury is instructed that all [twelve] jurors must agree that the same underlying criminal act has been proved beyond a reasonable doubt, a unanimous verdict on one criminal act will be assured. When the State chooses not to elect, this jury instruction must be given to ensure the jury's understanding of the unanimity requirement.

Petrich, 683 P.2d at 178. This either/or approach has also been adopted in Alaska and Hawaii. See Covington v. State, 703 P.2d 436, 441 (Alaska Ct. App. 1985), clarified on reh'g 711 P.2d 1183; State v. Arceo, 928 P.2d 843, 874-75 (Haw. 1996).

California applies the either/or approach to the election doctrine, but as the California Supreme Court recognized in Jones, "neither an election nor a unanimity instruction is very helpful where the victim is unable to distinguish between a series of acts, any one of which could constitute the charged offense." 792 P.2d at 650. As the Jones Court explained, in generic evidence cases, "it would be impossible for the prosecutor to select a specific act he relies on to prove the charge, or for the jury to unanimously agree the defendant committed the same specific act." Id.

Nonetheless, the Jones Court determined that protecting the accused's rights to proof of guilt beyond a reasonable doubt and jury unanimity may be achieved in generic evidence cases. To do so, the Jones Court explained, the victim's generic testimony must (1) describe "*the kind of act or acts committed* with sufficient specificity, both to assure that unlawful conduct indeed has occurred and to differentiate between the various types of proscribed conduct . . . ."; (2) identify "the *number of acts* committed with sufficient certainty to support each of the counts alleged in the information or indictment (e.g., 'twice a month' or 'every time we went camping')"; and (3) designate "*the general time period* in which these acts occurred (e.g., 'the summer before my fourth grade,' or 'during each Sunday morning after he came to live with us') to assure the acts were committed within the applicable limitation period." Id. at 655. Although "[a]dditional details regarding the time, place or circumstance of the various assaults may assist in assessing the credibility or substantiality of the victim's testimony," such details "are not essential to sustain a conviction." Id. at 656. "[T]he particular details surrounding a child molestation charge are not elements of the offense and are unnecessary to sustain a conviction." Id. at 655. "To hold that such testimony, however credible and substantial, is inadequate to support molestation charges would anomalously favor the offender who subjects his victim to repeated or continuous assaults." Id. at 645; see also State v. Wilcox, 808 P.2d 1028, 1033 (Utah 1991). "With the exception of those who happen to select victims with better memories or who are one act offenders, the most egregious child molesters effectively would be insulated from prosecution." Brown IV, 780 P.2d at 886. Therefore, the Jones Court explained, if the victim's testimony satisfies the foregoing specificity standards, the evidence would be sufficiently specific to allow the jury to determine guilt beyond a reasonable doubt. 792 P.2d at 655.

The Jones Court also rejected "the contention that jury unanimity is necessarily unattainable" in generic evidence cases, explaining that, "although the jury may not be able to readily distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described." Id. at 658. Where a defendant is charged with two sexual offenses during a particular period, but

> the child victim testified that such conduct took place *three times* during
> that same period, and the jury believed that testimony in toto, its difficulty
> in differentiating between the various acts should not preclude a conviction

of the two counts charged, so long as there is no possibility of jury disagreement regarding the defendant's commission of any of these acts.

Id. To ensure unanimous jury verdicts in generic evidence cases, the Jones Court prescribed "a modified unanimity instruction which, in addition to allowing a conviction if the jurors unanimously agree on specific acts, *also allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim.*" Id. at 659 (emphasis added). The Jones Court emphasized that credibility is usually the "true issue" in generic evidence cases, and

> the jury either will believe the child's testimony that the consistent, repetitive pattern of acts occurred or disbelieve it. In either event, a defendant will have his unanimous jury verdict and the prosecution will have proven beyond a reasonable doubt that the defendant committed a specific act, *for if the jury believes the defendant committed all the acts it necessarily believes he committed each specific act.*

Id. (internal citations omitted) (emphasis added).

Other state courts have adopted the Jones approach to satisfying the election doctrine in generic evidence cases. See, e.g., Thomas v. People, 803 P.2d 144, 153 (Colo. 1990) (holding "that when the evidence does not present a reasonable likelihood that jurors may disagree on which acts the defendant committed, the prosecution need not designate a particular instance"); Baker, 948 N.E.2d at 1177 (adopting Jones and holding that "the State may in its discretion designate a specific act (or acts) on which it relies to prove a particular charge"); State v. Muhm, 775 N.W.2d 508, 520 (S.D. 2009) (using the Jones either/or rule to find harmless error on appeal).

Alabama was the state with election law most similar to Tennessee when it adopted the Jones approach for generic evidence. See R.L.G., Jr., 712 So. 2d at 366-67. Through March 1997, the Alabama Supreme Court had declined to adopt the either/or approach and "upheld the strict election rule," requiring the prosecution to elect a specific instance of sexual abuse for conviction, as this Court has done. Id. at 362. In late 1997, the Alabama Court of Criminal Appeals, its members perhaps finding themselves where we find ourselves today, adopted the Jones approach in R.L.G., Jr., stating:

> The facts before us do not lend themselves to a straightforward application of the general law of election as it currently stands in Alabama [.] . . .
>
> . . . .

. . . It is a certain reality that "testimony describing a series of essentially indistinguishable acts of molestation is frequently the only testimony forthcoming from the victim." Jones, 792 P.2d at 645. . . . After weighing the considerations discussed above, we adopt, for purposes of this case, the "either/or" rule, but *only* as that rule is modified for generic evidence: where the evidence of more than one incident of sexual molestation to a child victim by a resident child molester is purely generic and where "there is no reasonable likelihood of juror disagreement as to particular acts, and the only question [for the jury] is whether or not the defendant in fact committed all of [the incidents]," the trial court should instruct the jury that it can find the defendant guilty only if it unanimously agrees that he committed all the incidents described by the victim. Jones, 792 P.2d at 659.

Id. at 356, 366-67. The Alabama Supreme Court affirmed in its entirety the Court of Criminal Appeals' decision adopting the Jones approach, and declared that "in cases involving purely generic evidence . . . an alleged child molester can be afforded all the process he or she is due, without requiring" strict election. Ex Parte R.L.G., Jr., 712 So. 2d 372, 373 (Ala. 1998).[12] Thus, in purely generic evidence cases, Alabama now ensures jury unanimity by way of the Jones modified unanimity instruction. Id.[13]

---

[12] The Alabama Supreme Court has subsequently further relaxed the strict election rule, holding the either/or rule applies in cases that involve both generic and specific evidence of sexual abuse on a child by a resident molester. See R.A.S. v. State, 718 So. 2d 117, 122 (Ala. 1998). Because this case involves only generic evidence, we need not decide how the election of offenses doctrine may be satisfied in a case involving both generic and specific evidence.

[13] The Alabama Court of Criminal Appeals urged its state legislature to address the practical problems associated with generic evidence cases by following the lead of California, which had statutorily created the new crime of continuous sexual abuse of a child. R.L.G., Jr., 712 So. 2d at 370. Statutes, like that enacted in California, typically provide that the criminal offense of continuous sexual abuse of a child is committed if a defendant abuses the victim a certain number of times within a specified time period and ordinarily explicitly dispense with the requirement that the jury unanimously agree as to the particular acts of abuse, so long as the jury unanimously agrees that the required number of abusive acts were committed within the specified time period. See, e.g., N.Y. Penal Law § 130.75(1) (2003) ("A person is guilty of course of sexual conduct against a child in the first degree when, over a period of time not less than three months in duration: (a) he or she engages in two or more acts of sexual conduct . . . with a child less than eleven years old; or (b) he or she, being eighteen years old or more, engages in two or more acts of sexual conduct . . . with a child less than thirteen years old."); Tex. Penal Code Ann. § 21.02 (2011) (providing that a person commits an offense if: "(1) during a period that is [thirty] or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims"); Jones, 792 P.2d at 652 ("[C]ontinuous sexual abuse of a child, . . . [requires] proof of three or more lewd or 'substantial' sexual acts with a child under fourteen over a period of at least three months, and unanimous jury agreement that three or more such acts occurred." (internal quotation marks omitted)); State v. Fortier, 780 A.2d 1243, 1250 (N.H. 2001) ("[O]ur legislature created [N.H. Rev. Stat. Ann. § 632-A:2] to respond to the legitimate concern that

### E. Tennessee Law and Generic Evidence

Today we join other state courts in concluding that, "[w]ith the exception of those who happen to select victims with better memories or who are one act offenders," strict application of the election doctrine in generic evidence cases would effectively insulate from prosecution "the most egregious child molesters" and unnecessarily frustrate the administration of justice in this State. See Brown IV, 780 P.2d at 886; see also Jacobsen v. State, 325 S.W.3d 733, 738 (Tex. Ct. App. 2010) (quoting Dixon v. State, 201 S.W.3d 731, 737 (Tex. Crim. App. 2006) (Cochran, J., concurring)) (internal quotations omitted) (warning that Texas was "headed for a train wreck in Texas law because [their] bedrock procedural protections [through strict election requirements] cannot adapt to the common factual scenario of an ongoing crime involving an abusive sexual relationship of a child under current penal provisions"). We conclude that the Jones approach to generic evidence cases of requiring a modified unanimity instruction as a substitute for the strict election doctrine will both enable prosecutors to seek justice for victims but also safeguard the accused's state constitutional right to a unanimous verdict. Where the prosecution relies on generic evidence, "the jury may not be able to readily distinguish between the various acts, [but the jury] is certainly capable of unanimously agreeing that they took place in the number and manner described" by the victim. Jones, 792 P.2d at 658.

Like the Alabama Court of Criminal Appeals, we adopt the Jones approach but limit it to cases involving only generic evidence. See R.L.G., Jr., 712 So. 2d at 362.[14] Where the prosecution presents non-generic evidence of distinguishable criminal acts, the prosecution must elect the specific act for which it seeks conviction in a manner that identifies the prosecuted offense for the jury. Shelton, 851 S.W.2d at 138. In such circumstances, an election is necessary to ensure a unanimous verdict and avoid the

---

(continued . . . )

many young victims, who have been subject to repeated, numerous incidents of sexual assault over a period of time by the same assailant, are unable to identify discrete acts of molestation.").

The Tennessee General Assembly enacted a statute in 2014 creating the offense of continuous sexual abuse, but this statute does not apply in this appeal. See Tenn. Code Ann. § 39-13-518 (2014) (limiting application to at least one incident occurring on or after July 1, 2014). Additionally, it is not clear whether the 2014 statute eliminates the practical difficulties associated with generic evidence cases, because, unlike the statutes enacted in other states, the 2014 statute specifically requires juror unanimity as to the acts of abuse. Id. § 39-13-518(e).

[14] As already noted, we reserve for an appropriate case the question of how the election doctrine may be satisfied in cases involving both generic and specific evidence.

Tidwell grab-bag theory of justice, which this Court has explicitly rejected. 922 S.W.2d at 501.[15]

But when the prosecution relies solely on generic evidence,

there is no reasonable likelihood of juror disagreement as to particular acts, and the only question is whether or not the defendant in fact committed all of them, the jury should be given a modified unanimity instruction which . . . allows a conviction if the jury unanimously agrees the defendant committed all the acts described by the victim.

Jones, 792 P.2d at 659. Clarifying the election doctrine in this unique circumstance will not impair a defendant's ability to present a defense. As the California Supreme Court recognized, "if the defendant has lived with the victim for an extensive, uninterrupted period and therefore had continuous access to the victim, neither alibi nor wrongful identification is likely to be an available defense" in generic evidence cases. Id. at 657. Typically, the central issue in such trials is credibility, with the victim testifying "to a long series of molestations and the defendant den[ying] that any wrongful touchings occurred." Id. Even if a defendant establishes an alibi defense to some of the charges, "there is no reason why the jury would be less inclined to credit the defense . . . merely because the victim's generic testimony has implicated the defendant in additional counts or offenses not challenged by the alibi." Id. To the contrary, where a defendant establishes an alibi as to "some of the time periods alleged in the information," the victim's testimony on the remaining counts could be "significantly undermine[d]." Id. Ultimately, the jury either will believe the child's testimony or disbelieve it.

Therefore, we hold that in generic evidence cases the prosecution need not elect a specific criminal act or incident as the basis of a conviction for each charge. Instead, the election doctrine may be satisfied in generic evidence cases by the trial court providing a modified unanimity instruction that allows a conviction only if the jury unanimously agrees the defendant committed all the acts described by the victim. However, consistent with prior decisions involving the election of offenses doctrine, the trial court must determine at the conclusion of the State's case-in-chief whether the proof is sufficiently specific as to apply the strict election requirement or whether the election requirement may be satisfied by giving the modified unanimity instruction. See Knowles, 470 S.W.3d at 423 (stating that election should occur at the close of the prosecution's case-in-chief).

---

[15] We reiterate that even if victims cannot recall exact dates, victims may still be able to describe with some particularity specific instances of sexual abuse if they are asked to do so. This evidence is always preferable. The prosecution in this case did not attempt at trial to elicit detailed testimony from the victims. Of course, this Court has no way of knowing whether the victims could have provided additional details, and the prosecution may have known that the victims were incapable of providing such testimony. We caution prosecutors not to rely on generic testimony if a victim is capable of describing the criminal acts with more particularity.

- 19 -

We invite the Tennessee Pattern Jury Instruction Committee to promulgate a pattern jury instruction for use in child sexual abuse cases involving generic evidence. See State v. White, 362 S.W.3d 559, 581 (Tenn. 2012) (inviting the Committee to promulgate a pattern jury instruction for use in trials involving kidnapping and an accompanying felony charge). Until the Committee develops an appropriate instruction, trial courts should use the following instruction in cases involving only generic evidence:

> The State has offered proof in its case-in-chief of more than one criminal act allegedly committed [by the defendant] [by one for whom the State alleges the defendant is criminally responsible]. To ensure a unanimous jury verdict [on the charge] [on each count of the indictment], the State must prove beyond a reasonable doubt the commission of all of the acts described by the alleged victim [as occurring within the time period charged] [as occurring within the time period charged in each Count of the indictment].

> In order to find the defendant guilty, you must unanimously agree that the State has proven beyond a reasonable doubt the commission of all of the acts described by the alleged victim [as occurring within the time period charged] [as occurring within the time period charged in each Count of the indictment].

Cf. Cal. Jury Instruction Crim. 4.71.5.

Of course, the trial court did not have the benefit of our holding in this appeal; thus, the jury did not receive a modified unanimity instruction. Therefore, we must review that omission under a constitutional harmless error analysis.

### F. Harmless Error Analysis

The election doctrine is "fundamental, immediately touching on the constitutional rights of an accused." Shelton, 851 S.W.2d at 137 (quoting Burlison, 501 S.W.2d at 804) (internal quotation marks omitted). Thus, we apply constitutional harmless error analysis to assess the error in this case. When conducting constitutional harmless error analysis, this Court has identified two categories of error—structural constitutional error and non-structural constitutional error. State v. Climer, 400 S.W.3d 537, 569 (Tenn. 2013).[16] Structural constitutional errors amount to "defects in the trial mechanism" that

---

[16] We have recognized a third category of error—non-constitutional error. For non-constitutional errors, "Tennessee law places the burden on the defendant . . . to demonstrate that the error more probably than not affected the judgment or would result in prejudice to the judicial process." State v. Rodriguez, 254 S.W.3d 361, 372 (Tenn. 2008) (quoting Tenn. R. App. P. 36(b)) (internal quotation marks omitted). This category is not at issue in this appeal. See Climer, 400 S.W.3d at 569.

"compromise the integrity of the judicial process itself," defy harmless error analysis and always require reversal. Id. (quoting State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008)) (internal quotation marks omitted). Non-structural constitutional error "requires reversal *unless* the State demonstrates beyond a reasonable doubt that the error is harmless." Id. (emphasis added) (quoting Rodriguez, 245 S.W.3d at 371) (internal quotation marks omitted). An appellate court evaluating non-structural constitutional error determines, based upon an examination of the record, "whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Id. (quoting Rodriguez, 245 S.W.3d at 371) (internal quotation marks omitted); see also Neder v. United States, 527 U.S. 1, 15 (1999); Chapman v. California, 386 U.S. 18, 24 (1967); State v. Cecil, 409 S.W.3d 599, 610 (Tenn. 2013). "If, at the end of that examination, the court cannot conclude beyond a reasonable doubt that the jury verdict would have been the same absent the error . . . [the appellate court] should not find the error harmless." Neder, 527 U.S. at 19.

Here, we are convinced beyond a reasonable doubt after examining the record that the erroneous lack of a modified unanimity instruction did not contribute to the verdict obtained and that the jury's verdict would have been the same had the modified unanimity instruction been given. Here, the defendant was convicted of thirty-seven counts of sexual battery by an authority figure. Both E.K.Q. and E.Q. testified that the defendant made unlawful sexual contact with each of them on a regular basis over an extended period of time. Both victims described the type of sexual contact, testifying that the defendant fondled their buttocks and vaginal areas. Both victims testified that the sexual contact occurred during the time periods charged in the indictment. Both victims testified that this sexual contact occurred at least once during each of the months charged in the indictment, with one victim testifying that it occurred weekly. Each victim testified that she saw the defendant touching the other victim. The victims' mother also corroborated their testimony, affirming that she had witnessed the defendant touching the victims. The defendant's guilt or innocence hinged on the jury's assessment of the credibility of the victims' testimony regarding the defendant's touching them. The other elements of sexual battery by an authority figure were established by undisputed proof. For instance, the proof showed that E.K.Q. and E.Q. were between thirteen and eighteen years of age when the sexual battery occurred. Undisputed proof also established that the defendant had parental authority over the victims and used that authority to accomplish the sexual contact. For instance, the victims were the defendant's daughters and lived with him during the time period charged in the indictment. E.K.Q. testified that she followed the defendant's instruction because he had previously beaten her when she disobeyed him, stating he had choked, stomped, and punched her. Likewise, E.Q. explained that she did not express her dislike of the defendant's fondling because had she done so, the defendant's response would have been "horrible" and she likely would have been beaten. The defendant told the victims it was appropriate for him to have sexual contact with them because he was their father and was teaching them what not to let others do.

Although the jury did not receive the modified unanimity instruction, the State elected the type of sexual contact—the defendant's act of fondling the victims' buttocks and vaginal areas over their clothing—on which it was relying and sought convictions for one offense per month, per victim.

The trial court explicitly discussed the need for juror unanimity in the jury instructions:

> Your verdict must represent the considered judgment of each of you as jurors. In order to return a verdict, it is necessary that each of you agree. Your verdict must be unanimous. It is your duty as jurors to consult with one another and to deliberate with a view to reach an agreement if you can do so without violence to your individual judgment.

Additionally, the defendant's defense was a blanket denial to any sexual battery by an authority figure. Cf. State v. Ducker, 27 S.W.3d 889, 899-900 (Tenn. 2000) (finding the error harmless beyond a reasonable doubt in part because the defendant's defense was not inhibited by the error). Although one of the victims testified that the sexual battery occurred once per week, we conclude beyond a reasonable doubt that there is no reasonable likelihood of juror disagreement as to particular acts. In other words, the record on appeal demonstrates beyond a reasonable doubt that by convicting the defendant, the jury expressed its unanimous conclusion that the victims were credible and that the defendant committed all the acts described by the victims.[17] Thus, we conclude beyond a reasonable doubt that the erroneous lack of the modified unanimity instruction did not affect the verdict obtained.

---

[17] Like the California Supreme Court, we caution prosecutors to exercise their charging discretion wisely in generic evidence cases. Jones, 792 P.2d at 654. "No valid purpose would be served by charging hundreds or thousands of separate counts of molestation, when even one count may result in substantial punishment." Id.

## III. Conclusion

In summary, we hold that the election doctrine does not require the prosecution to identify a single incident in cases, such as this one, where the child victim testifies to repeated incidents of sexual contact occurring over a substantial period of time but is unable to furnish specific details, dates, or distinguishing characteristics as to individual incidents of sexual battery. As have courts in other jurisdictions, we hold that where a prosecution is based solely on such generic evidence, the election doctrine is satisfied by providing the jury with a modified unanimity instruction that allows a conviction only if the jury unanimously agrees the defendant committed all the acts described by the victim. Although the absence of such a modified unanimity instruction amounts to non-structural constitutional error, in this case the error is harmless beyond a reasonable doubt. Accordingly, we reverse the Court of Criminal Appeals' judgment vacating the defendant's convictions of sexual battery by an authority figure and reinstate the trial court's judgment approving the jury's verdict. It appearing the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
CORNELIA A. CLARK, JUSTICE