IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs June 25, 2019

## STATE OF TENNESSEE v. MICHAEL ANDREW LETHCO

**Appeal from the Criminal Court for Monroe County**
**No. 585510    Sandra Donaghy, Judge**

_____

### No. E2018-01042-CCA-R3-CD

_____

The defendant, Michael Andrew Lethco, was convicted of aggravated sexual battery for which he received a nine-year sentence. On appeal, he challenges the sufficiency of the evidence supporting his conviction and asserts the State elicited improper testimony from the victim regarding other instances of abuse which prejudiced the defendant. Upon our thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. Ross Dyer, J., delivered the opinion of the court, in which Norma McGee Ogle and Robert H. Montgomery, Jr., JJ., joined.

Steven B. Ward, Madisonville, Tennessee, for the appellant, Michael Andrew Lethco.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Stephen D. Crump, District Attorney General; and Dorothy Cherry and Clay Collins, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

### *Facts and Procedural History*

A Monroe County grand jury indicted the defendant for one count of aggravated sexual battery committed against his nine-year-old daughter, the victim. The crime occurred in 2012, but the victim did not disclose the defendant's abuse until 2014. When the defendant's trial began in 2017, the victim was thirteen years old. At trial, she testified that after her parents separated in 2012, the defendant moved into a one-bedroom apartment for approximately two months. The victim frequently visited the defendant and often spent the night with him. During the visits, the victim slept in the bed with the

defendant rather than on the couch in the living room. She slept in Pull-Ups and a t-shirt while the defendant wore "just shorts." The victim testified she did not know why no one slept on the couch in the living room during her visits. However, on cross-examination, she acknowledged there were hornets in the ceiling fan in the living room.

During one visit, the defendant came to bed as the victim "was about to go to sleep." The victim was lying with her back to the defendant when he "reached over," put his arm around her waist, and "then put his finger in [her] vagina." The defendant did not move his hand while it was in her vagina, but the victim described the act as painful. To make the defendant stop, the victim "rolled over, like away from him."

The victim stated she did not discuss the incident with the defendant, but she did tell her mother. However, the victim explained she waited "a long time" to tell her mother because she was scared and she "didn't know what was going on." After telling her mother, the victim no longer visited the defendant. The victim also testified the defendant usually snored in his sleep, but he was not snoring before he touched her. The abuse occurred more than once, but the victim did not know how many times it happened. After the defendant began dating someone, the victim no longer slept in the bed with him during her visits.

The victim's mother, the defendant's ex-wife, stated after they separated in 2012, the defendant rented an apartment on Ball Play Road in Monroe County, Tennessee, for approximately two months. While living at the apartment, the victim visited the defendant "twenty or thirty times." At the time, the victim wore Pull-Ups to bed.

Though the victim did not disclose the defendant's abuse until 2014, her mother stated the victim mentioned the abuse in passing in 2013. The victim's mother questioned her further and confronted the defendant. The defendant "kind of brushed it off and said nothing happened," and the victim's mother did nothing further. After the victim's disclosure in 2014, her mother reported the abuse to the Department of Children's Services. The victim's mother did not confront the defendant again, and the victim no longer visited him.

The victim's mother and the defendant divorced in late February or early March 2014. She described the defendant's sleeping habits during their marriage, noting he fell asleep quickly, was a sound sleeper, and snored in his sleep. She also stated the defendant once attempted to have sex with her while he was asleep. The defendant woke up prior to ejaculating and apologized to her.

Courtney Stapp, a child protective services investigator for the Department of Children's Services, interviewed the victim on March 25, 2014, and set up a forensic

interview of the victim on April 9, 2014. Ms. Stapp also interviewed the defendant and the victim's mother. Ms. Stapp could not recall if she questioned the mother about the defendant's sleeping habits. Further, Ms. Stapp did not speak with Samantha Lethco, the defendant's current wife.[1]

During Ms. Stapp's testimony, the State offered into evidence two recorded interviews of the defendant. The first interview consisted of video footage of Detective Tonia Norwood's initial interview of the defendant. The second interview included a voice recording of the defendant's testimony given during an adjudication hearing in Juvenile Court for Anderson County on July 15, 2014. The trial court provided a limiting instruction to the jury in response to each recording, stating evidence of other crimes mentioned in the recordings "may only be considered by you for the limited purpose of determining whether it provides the complete story of the crime or guilty knowledge."[2]

After the State rested its case, the defendant presented testimony from his mother, Lydia Gail Lethco, and Samantha Lethco, regarding his sleeping habits. Lydia testified the defendant is a heavy sleeper who has always had difficulty waking up, noting alarm clocks do not suffice. Instead, he requires either physical touching or light to wake him. Lydia also stated the defendant occasionally did things in his sleep of which he was unaware. For example, when the defendant was seven years old, he woke up outside in the yard of their home but had no memory of how he got there. She stated the defendant still has sleep issues.

Regarding the present allegations, the defendant told Lydia "that he was asleep and woke up with his hand in the waistband of [the victim's] Pull-Up, and that he pulled it away immediately. And that he was ashamed of it. And he was very sorry that it happened." Lydia was unaware the victim alleged the defendant touched her on multiple occasions and stated she has had limited contact with the victim since the allegations emerged.

Samantha started dating the defendant on October 13, 2012. In February 2013, she and her three children began living with the defendant. She stated her children do not sleep with the defendant, but she would let them. She also described the defendant as a sound sleeper and noted she typically has to push or shake him in order to wake him. The defendant usually wears boxers or shorts to bed and has attempted to climb things and has engaged in conversations with her while asleep. In addition, the defendant has

[1] Because several witnesses have the same last name, Lethco, we will refer to them by their first name. We intend no disrespect.

[2] In the recordings, the defendant denied touching the victim on more than one occasion despite references to the victim's statements that the defendant touched her more than once.

had sex with her while asleep but had no memory of it the next morning. Samantha provided an example, stating one night they had sex and the defendant woke up the next morning with scratches on his back. When he questioned her about the scratches, Samantha stated they happened during sex. The defendant, however, stated he had no memory of having sex with her the previous night and claimed he was asleep while they had sex.

Nathan Brackett also testified on the defendant's behalf, describing him as hard-working, honest, and dependable. In the six years he has known the defendant, Mr. Brackett has never seen the defendant behave in a way that was concerning towards him or children. Mr. Brackett admitted the defendant did not discuss the reason he was on trial with him.

The defendant testified he is thirty-four years old and splits time between living with his current wife and his parents. Growing up, the defendant occasionally had issues in his sleep, including walking into door frames, stubbing his toe, and waking up outside. The defendant explained he continued to have sleep issues as an adult and recalled the time he woke up while having sex with his ex-wife, the victim's mother. The defendant stated his sleep issues were not "always about sex," noting the issues sometimes revolved around his previous day or dreams he was having while asleep. According to the defendant, when these incidents occur, he has "no clue" he has done anything in his sleep. Despite this knowledge, the defendant testified he still chose to sleep in the bed with the victim.

The defendant testified he was married to the victim's mother for approximately ten years. The last two years of their marriage they spent separated. After the initial separation, the defendant rented a one-bedroom apartment on Ball Play Road for about two months. The ceiling fan in the living room was infested with hornets and as a result, neither he nor the victim slept on the couch. Instead, they slept in the bed together because the victim was scared, and she did not want to sleep on a blowup mattress.

The defendant stated he and the victim only slept in the bed together once, the night of the incident. That night, the defendant slept in boxers and the victim slept in Pull-Ups and a t-shirt. The defendant woke up to the victim "moving around a little bit." The defendant stated he "normally [] would be a hard sleeper, but we'd just moved into this place." When he woke up, his "hand was in [the victim's] Pull-Up." The defendant did not "even know why it was in there. [The victim] had her back to me." He stated, "I didn't touch it intentionally. I just remember waking up with my hand in her Pull-Up on her vagina area like right above it." When the defendant realized his hand "was in [the victim's] Pull-Up," he "jerked it out," and they both went back to sleep. The defendant believed this happened "pretty late" around "1:00 or 2:00 in the morning."

The next morning, the victim told the defendant he "was rubbing her." The defendant "asked her what she meant by rubbing her," and the victim "just said you were rubbing me, you know, under my Pull-Up." He admitted he did not initiate a conversation with the victim because "[i]t wasn't the first thing I wanted to speak about as soon as you got up." However, according to the defendant, they did discuss the incident, as follows:

> And we talked about it and I explain -- tried to explain it. I don't know how to explain that to a child, even my own daughter. You know, only thing I could think of, I'm used to being in the bed with your mother and doing things and never even give a second thought to it, because it's your wife, why would you. Nobody cares about that. And she understood, and it never got talked about ever again. Nothin' -- she never said nothin' about it.

During their discussion, the defendant apologized to the victim and asked if he hurt her, but the victim stated he did not. The defendant assumed the victim would tell her mother, but she did not and "everything went on as normal." They never discussed the incident again, and the defendant no longer "allow[ed] [the victim] to be in the bed with [him]." The defendant did not discuss the incident with the victim's mother.

Over a year later, the defendant received a phone call from Detective Norwood. Initially, he did not know why Detective Norwood wanted to meet with him, but "they finally said, that I touched [the victim]." The defendant stated he was "scared and ashamed" upon realizing the subject matter of the interview and admitted he initially did not remember the incident while speaking with Detective Norwood as he had "shut it out of [his] mind." However, he eventually "told everybody what happened. It was just an accident. It wasn't intentional. I didn't go to bed thinking, I want to do this to my child. I mean, my gosh. I don't know why anybody would want to think that." The defendant denied any other instances of abuse and stated he was not sexually attracted to young girls.

The defendant stated he has not spoken with the victim in almost three years but wishes he "could have told her sorry again" and if he could speak with her now he would tell her, "I'm sorry. Will you forgive me?" The defendant blames the victim's mother for his current situation and "the exaggeration of the truth" resulting from the victim's fear. The defendant agreed he did not remember having sex with individuals during his sleep but refused to believe he could have abused the victim more than once. The defendant stated the victim never confronted him about any other instances of abuse. The

- 5 -

defendant maintained he did not intentionally touch the victim's vagina and acknowledged he should have acted differently, specifying:

> I really don't know what to do in that kind of a room, but not being in the bed with her would have been a start. I could [have] made her slept on the floor, or I slept in the floor. We both didn't want to be in the living room, you know, at that time. That was the whole time we lived there with that problem, was the bee stuff.

The defendant then rested his case.

At the conclusion of the proof, the State made an election of offenses. In reading the jury instructions, the trial court specified the State's election, as follows:

> Election of offense. The State has offered proof in its case-in-chief of more than one act allegedly committed by the [d]efendant, which the State alleges constitutes an element of the offense of aggravated sexual battery as charged in the indictment.
>
> To ensure a unanimous verdict, the law requires the State to elect which alleged act testified to, the State is relying upon for your consideration in deciding whether or not the [d]efendant is guilty of this offense or any lesser included offense.
>
> The fact that the Court has required the State to elect, does not mean that the State has found the has (sic) carried its burden of proving those allegations beyond a reasonable doubt. That is for your determination. I'm gonna put an R there. (Indicating)
>
> In this case, the State has elected to submit for your consideration the alleged act of sexual contact occurring at the Ball Play apartment in Tellico Plains, Tennessee, when Mr. Lethco woke up with his hand on [the victim's] vagina.
>
> Members of the Jury, you are to consider only this alleged act in deciding whether the Defendant has been proven guilty beyond a reasonable doubt of the offense charged and included in the indictment.

The jury convicted the defendant of one count of aggravated sexual battery. The trial court sentenced the defendant as a Range I offender and imposed a nine-year

sentence to be served at 100%. The defendant filed a motion for new trial which was denied by the trial court. This timely appeal followed.

## *Analysis*

I.  Sufficiency of the Evidence

The defendant challenges the sufficiency of the evidence supporting his conviction for aggravated sexual battery, arguing the State failed to prove he acted intentionally. The State asserts the evidence was sufficient to support the defendant's conviction, and we agree.

When the sufficiency of the evidence is challenged, the relevant question for the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)). The jury as the trier of fact must evaluate the credibility of the witnesses, determine the weight given to witnesses' testimony, and reconcile all conflicts in the evidence. *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *Dorantes*, 331 S.W.3d at 379 (citing *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006)). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.*

The defendant was convicted of aggravated sexual battery. "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant" where "the victim is less than thirteen years of age." Tenn. Code Ann. § 39-13-504. "'Sexual contact' includes the intentional touching of the victim's[] [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's[] [or] the defendant's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6).

At trial, the victim detailed the defendant's actions supporting his conviction for aggravated sexual battery. The testimony established the victim's parents separated in 2012, after which the defendant moved into a one-bedroom apartment on Ball Play Road. At the time, the victim was eight years old and required Pull-Ups at night. When the victim visited the defendant at the apartment, she slept in the bed with him. The victim testified one night after the defendant came to bed, he reached across her waist and put his hand under her Pull-Up and his finger in her vagina. The victim rolled away from the defendant, and the defendant removed his hand. The defendant argued he was asleep when he touched the victim's vagina but admitted to sleeping in the bed with the victim and to waking up one night with his hand in her Pull-Up. Though the defendant denied he intentionally touched the victim because he was asleep during the act, the jury was not persuaded as evidenced by their verdict. This Court will not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Dorantes*, 331 S.W.3d at

379. Accordingly, sufficient evidence exists to show the defendant committed aggravated sexual battery against the victim and the defendant is not entitled to relief.

## II. Improper Testimony

The defendant asserts he was prejudiced when the State elicited testimony from the victim regarding "multiple" instances of abuse. The defendant also asserts "the State repeatedly, engaged in conduct designed to convince the jury that there were multiple offenses." We disagree and initially note the defendant has failed to identify the victim's testimony or the State's conduct he alleges was improper. Absent "appropriate references to the record," this issue is waived. Tenn. R. App. P. 27.

However, aside from waiver, the defendant still is not entitled to relief as the record indicates the State elected the offense upon which it relied and the trial court properly instructed the jury on the election. Tennessee courts have repeatedly held that the State must elect the particular offense for which a conviction is sought and must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1998); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997); *State v. Shelton*, 851 S.W.2d 134, 136 (Tenn. 1993); *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973). As noted by our supreme court, "the constitutional guarantee of juror unanimity is readily satisfied . . . because it is a general rule that evidence the defendant has committed 'some other crime wholly independent of that for which he is charged, even though it is a crime of the same character' is generally excluded as 'irrelevant.'" *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016) (quoting *State v. Rickman*, 876 S.W.2d 824, 827 (Tenn.1994) (internal quotations omitted); *see also* Tenn. R. Evid. 404(a) & (b). This rule is "relaxed in the sex crimes context, specifically in cases where the defendant is alleged to have committed sexual offenses over a lengthy period of time against young children who are often unable to identify the dates on which particular acts were perpetrated." *Id.* (internal citations omitted). "Therefore, 'where the indictment charges that sex crimes occurred over a span of time,' rather than on specific dates, then 'evidence of unlawful sexual contact between the defendant and the victim allegedly occurring during the time charged in the indictment is admissible.'" *Id.* (citing *Rickman,* 876 S.W.2d at 828).

Here, the record indicates the victim answered affirmatively when asked if the defendant touched her on more than one occasion while visiting the apartment on Ball Play Road. As a result, the State made an election of offenses at the conclusion of the proof in order to effectively limit the jury's consideration of the facts to support a conviction for aggravated sexual battery. The State defined the crime as "the alleged act of sexual contact occurring at the Ball Play apartment in Tellico Plains, Tennessee, when Mr. Lethco woke up with his hand on [the victim's] vagina." As noted above, the

testimony elicited at trial was sufficient to support the elected offense as the victim testified the defendant put his finger in her vagina while sleeping in the bed with her at the Ball Play apartment. The jury rejected the defendant's argument, that he was asleep while he touched the victim, and convicted him for his act. Accordingly, based upon our review of the record, we conclude the State effectively elected the specific offense upon which it relied in convicting the defendant, a point the defendant concedes. The trial court also provided a limiting instruction to the jury regarding references to additional instances of abuse. As a result, the brief references to other instances of abuse by the victim did not prejudice the defendant or risk the unanimity of the jury's verdict. This issue is without merit and the defendant is not entitled to any relief.

### *Conclusion*

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
J. ROSS DYER, JUDGE