IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 10, 2024

## STATE OF TENNESSEE v. CHRISTOPHER JOSEPH RILEY

**Appeal from the Criminal Court for Davidson County**
**No. 2018-C-1973     Angelita Blackshear Dalton, Judge**

————————————————————

### No. M2022-01529-CCA-R3-CD

————————————————————

Defendant, Christopher Joseph Riley, was convicted by a jury of felony murder by aggravated child abuse (count one), felony murder by aggravated child neglect (count two), two counts of aggravated child abuse (counts three and five), reckless endangerment (count four), aggravated child neglect (count six), and two counts of child abuse (counts seven and eight). Defendant was sentenced to a total effective sentence of life imprisonment plus forty-eight years. On appeal, Defendant claims the trial court erred in failing to require the State to make an election of offenses at the close of the proof, and that the trial court improperly imposed consecutive sentences. Following our review of the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TIMOTHY L. EASTER, JJ., joined.

Jesse Lords, Brentwood, Tennessee (on appeal), and Robert Vaughn (at trial), for the appellant, Christopher Riley.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jeffrey A. George and Janice Norman, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This tragic case arose when Defendant offered to care for the three-year-old victim while her mother worked the evening shift on Friday, May 25, 2018. The victim died from the injuries she sustained while under Defendant's care. Accordingly, the Davidson

County Grand Jury entered a true bill charging Defendant in a nine-count indictment. He was charged with two counts of first degree murder under separate theories: felony murder by aggravated child abuse (count one) and felony murder by aggravated child neglect (count two). He was also charged with three counts of aggravated child abuse (counts three, four, and five), one count of aggravated child neglect (count six), and three counts of child abuse (counts seven, eight, and nine).

Defendant does not contest the sufficiency of the evidence. However, in order to bring the issues raised into proper focus, an evidentiary synopsis is appropriate. At trial, those who knew the victim described her as a "precocious," "outgoing," and "articulate" child with an "amazing vocabulary" for a three-year-old child. The victim and her mother lived in an apartment located less than a ten-minute drive from the mother's workplace. The mother and the victim had recently moved to Nashville to be closer to extended family. The mother had grown up in Nashville and upon her return, became reacquainted with a couple of people she knew when she was younger, David Walker and Defendant. Mr. Walker and the victim's mother ("the mother") were dating at the time of the incident. Mr. Walker had a car seat in his car for the victim. The mother did not have a car and had to rely on others for transportation.

The victim spent the evening prior to the incident with her grandmother who recalled the victim being "happy and playful." The grandmother testified that she had given the victim a bath the evening before and saw no injuries, bruises or scratches on the victim's body. The mother likewise testified that when she changed the victim's clothing after she had been dropped off by the grandmother, she observed no injuries on the victim's body. The mother explained that the victim was in the process of potty training and wore pull-ups which the mother also changed that morning. Mr. Walker testified that the victim had no major prior injuries. He also saw the victim the morning of the incidents and recalled her being "fine" and "happy."

The mother had arranged for a friend to babysit the victim while she worked that evening, but the friend failed to show up and could not be contacted. Other members of the extended family were unable to babysit the victim due to prior engagements. Defendant had stopped by the mother's apartment that afternoon and he volunteered to care for the victim. Defendant had never before babysat the victim and acknowledged at trial that he conducted multiple drug transactions while he was babysitting her.

Defendant was alone with the victim at the mother's apartment from 4:30 p.m., when he dropped off the mother at work, until approximately 9:30 p.m., when one of Defendant's friends, Zachery St. Lawrence, came to the victim's apartment. At the time, Mr. St. Lawrence and Defendant were "close" and worked together in selling marijuana. Mr. St. Lawrence admitted that he went to the mother's apartment to give Defendant

marijuana to sell.  Mr. St. Lawrence testified that he "definitely believed [Defendant] was under the influence of drugs" that evening and recalled that Defendant was "nervous," "frantic," and seemed "really worried."  Defendant told Mr. St. Lawrence that the victim fell at a park and hurt her shin, got a rug burn on her chin from falling on the carpet when entering the apartment, and fell on her face while standing on a child's chair.  Mr. St. Lawrence saw the chair and testified that it stood a foot off the ground.

Mr. St. Lawrence observed the victim laying on her side on a pull-out bed in the living room.  She was "quietly sobbing."  Defendant stated that the victim was giving him the silent treatment.  When Mr. St. Lawrence knelt down to look at her and asked her if she was okay, the victim did not respond but made eye contact with Mr. St. Lawrence and moved one of her arms closer to her face.  Mr. St. Lawrence saw a bruise on the side of her face and another mark on her chin.

Mr. St. Lawrence testified that he checked on the victim periodically and she continued to cry.  After Defendant stepped outside the apartment to sell the marijuana Mr. St. Lawrence had brought him, Mr. St. Lawrence observed that the victim was non-responsive.  Mr. St. Lawrence told Defendant that they needed to call for an ambulance, but Defendant told him that the mother was returning home "any minute" to take the victim to the hospital.  Mr. St. Lawrence and Defendant decided they could use nail polish remover as a smelling salt to revive the victim.  While Mr. St. Lawrence checked the apartment for nail polish remover, Defendant remained with the victim.  Mr. St. Lawrence testified that Defendant was patting the victim on the buttocks and bouncing her around.  He thought Defendant was treating the victim roughly so he took her from Defendant.  He splashed a cup of water on the victim's face to revive her.  As Mr. St. Lawrence held the victim, she seized up, her elbows locked, and then she went limp in his arms before the mother arrived to take her to the hospital.

Mr. St. Lawrence testified that Defendant asked him to say that he witnessed the victim fall.  Defendant was fearful that the victim would say that he hit her.  After he had learned about the scope and gravity of the victim's injuries, Mr. St. Lawrence told the authorities that he had lied for Defendant and had not seen the victim fall.

Tammy Farris testified that she arrived at the apartment complex "right before [10:00 p.m.]"  She acknowledged that she was there to purchase marijuana from Defendant.  Defendant ran outside and entered her car, "sweaty and out of character."  He told her he was babysitting a child who had fallen from a climbing rope at a park and sustained a rug burn on her chin.  The victim had reportedly fallen two more times when she got home.  Defendant told her the victim caught herself the first time, but fell "straight down" the second time and began to act "loopy."  Ms. Farris thought the victim may have suffered a concussion and offered to take a look at her, but Defendant told her no.  Ms. Farris told

him that she would call an ambulance, but Defendant told her not to because the mother was on the way home and had told him not to call. Ms. Farris told Defendant she was going to the restaurant where the mother worked so she would make sure the mother had left the restaurant to return home. She told Defendant that he had "one hour," at which time she would return and call for an ambulance. Ms. Farris testified that she had never seen Defendant sober "[u]ntil today," at trial.

While the mother was at work, she communicated with Defendant through Mr. Walker who was at the restaurant. The mother was not permitted to use her cell phone at work, so she asked Mr. Walker to contact Defendant to check on the victim. Mr. Walker and Defendant continued to text each other throughout the mother's shift. Mr. Walker testified that he first became aware that something might be wrong with the victim between 8:00 and 9:00 p.m. Defendant's cell phone records including his text messages were introduced as exhibits. They revealed that at 8:00 p.m., Defendant texted Mr. Walker that the victim had fallen at a park and had injured her shin. Defendant and Mr. Walker continued to text each other about the victim and other matters, but it was not until 10:06 p.m. that Defendant texted Mr. Walker with the following message: "[the victim] needs to go to the hospital like forreal (sic)."

The mother testified that she spoke to Defendant three times after she finished her shift. She first spoke to him before 10:00 p.m. as she was clocking out. He told her that everything was okay but that the victim was "giving him the silent treatment." He did not sound frantic, and it did not sound serious. She talked to him a second time as she got into Mr. Walker's car to return home. Defendant repeated what he had told her earlier and made no mention of dialing 911 or calling for an ambulance. The mother grew concerned when she spoke to Defendant the third time. As she was talking to Defendant, Mr. St. Lawrence got on the phone and asked her where he could find nail polish remover to revive the victim because she was "not giving him eye contact."

The mother ran inside her apartment and found Mr. St. Lawrence holding the victim in his arms. The victim was not moving. The mother took the victim and yelled at Mr. Walker to go to the hospital. The victim began seizing up during the ride to Saint Thomas Hospital ("Saint Thomas"). The mother noticed a bruise on the right side of the victim's face from the top of her eyebrow to the bottom of her chin. She also had a scrape across her chin. The victim was at Saint Thomas only thirty minutes before she was transported to Vanderbilt Children's Hospital ("Vanderbilt") where she died on May 27, 2018.

The mother gave consent to search her apartment as part of the criminal investigation into the victim's death. One notable observation in the apartment was an indention in a bookcase that was not there before the mother left for work. Strands of hair

were found in the bookcase. The strands were tested but were inconclusive as to whether they matched the victim's DNA profile due to limited quantitative data.

The day after the victim died, Defendant contacted Detective Jaren Breece of the Metropolitan Nashville Police Department. Defendant told him that he was babysitting a friend's child and that the child had fallen when they were together at a park, injuring her shin. Defendant recounted how the victim fell again in the parking lot of the apartment complex and "busted her chin." Defendant stated that the victim "fell flat" and did not try to brace herself from the fall. Defendant mentioned the victim "falling again," but Detective Breece was uncertain whether Defendant was referring to the earlier falls or a third fall. Defendant did not mention the victim falling off a chair in the apartment. Defendant told Detective Breece when the victim became unresponsive, he smacked her on the buttocks to wake her. He denied punishing the victim.

Defendant testified that when he arrived at the victim's home on May 25, 2018, the victim was "acting normally" and had no bruises. Regarding the allegations of abuse, Defendant testified that he did not witness the victim fall in the park because he was on his cell phone. It was not until he heard the victim cry and yell that he looked up to see that the victim was on the ground next to a play castle and holding her shin. He picked her up and "bounced her around." Defendant stated that the victim "calmed down super quick." Defendant testified that the victim tripped as she ran into the apartment and fell with her backpack on. She was unable to catch herself and hit her "shin (sic) hard" on the carpet. She began crying immediately. He saw that she had a rug burn on her chin as result. As he prepared a frozen pizza and put it in the oven, he heard "a bam." The victim was standing in her chair and had fallen on the floor. Afterward, the victim become unconscious and began having seizures.

Defendant admitted to smacking the victim's buttocks and splashing water on her face "to keep her awake." He believed that she had sustained a concussion. He even admitted that he had been "rough," and was unconcerned about bruising her because he believed that he was "doing something to preserve her life." He agreed that he hit the victim's face hard enough to cause bruises on her face. He also admitted to hitting her shin. He denied that he beat the victim or slammed her head into the bookcase. He punched the bookcase with his fist out of frustration while waiting for the mother and Mr. Walker.

Three physicians who observed and examined the victim's condition testified about the victim's injuries at trial: Dr. Anvesh Reddy, Dr. Randy Tashjian, and Dr. Deborah Lowen. Dr. Anvesh Reddy, a pediatric ophthalmologist at Vanderbilt was consulted because the victim sustained retinal hemorrhages strongly suggestive of non-accidental trauma. Dr. Reddy testified that the victim had extensive macular retinoschisis. Dr. Reddy explained that retinoschisis is the separating of retinal layers where bleeding exists in front

of, within, and under the retina. The presence of smaller hemorrhages suggested that the injuries were recently caused, or as little as twenty-four to seventy-two hours prior to his consultation. According to Dr. Reddy the "constellation of ophthalmic findings [were] consistent with trauma, [and] highly suspicious for non-accidental etiology and shaking injury."

Dr. Reddy testified it was "not physically possible" for retinoschisis to be caused by an accidental fall or a fall from a short distance. He added that a fall from a climbing rope device on a playground, repeated falls from a child's height, a fall from a height of six or seven feet, or a fall from a child's chair were inconsistent with the victim's injuries. He testified that the "type of fall" causing the victim's retinal injuries were consistent with "a multi-story fall with massive crush injury to a child's head."

Dr. Randy Tashjian, assistant medical examiner, conducted the victim's autopsy and ruled the victim's manner of death a homicide; her cause of death, blunt force head trauma; and the circumstances of her death, "injuries inflicted upon the individual by others or another." Dr. Tashjian's autopsy report, along with an investigation report from the Davidson County Medical Examiner's Office, and a toxicological report from an independent laboratory were introduced as a collective exhibit. Dr. Tashjian testified that at the time of her death, the victim stood three feet, four inches tall.

In terms of internal injuries not readily visible to the eye, Dr. Tashjian testified that intracranial pressure and brain swelling from blunt force trauma contributed to the victim's death. He observed subdural hematoma, a collection of blood around the brain, and concluded that it was caused by blunt force. He explained that blunt force trauma is a generalized term and includes injuries caused by a blunt object or accelerated movement such as whiplash where there is no actual impact. He testified that the victim's brain injury could not have been caused by falling from a standing position or falling off a chair one to four feet off the ground because a fall from a short distance is insufficiently high enough to cause such an injury.

Dr. Tashjian agreed with Dr. Reddy's conclusion that the victim had retinoschisis which occurs when "different tissues moving at different velocities relative to one another caus[e] traction and tearing of the[] tissues." This is known as acceleration/deceleration movement. He also agreed with Dr. Reddy that the victim's retinal hemorrhages would have been caused by a multi-story fall or a motor vehicle accident, not a fall from a standing position. He testified that hypothetically retinoschisis would be consistent with a grown man grabbing a child and repeatedly slamming the child's head into a piece of furniture hard enough to break the furniture.

- 6 -

Another internal injury the victim sustained was the fracture of her right collarbone. Dr. Tashjian explained that there would have to have been "sufficient or strong enough force to cause a clean break like that." He imagined there would be "some degree of pain and discomfort especially in a younger individual." He testified that while it is possible for a child to break her collarbone by falling on a flat surface, the type of force needed to produce a fracture would have to be "pretty high."

In terms of the victim's external injuries, Dr. Tashjian testified that the victim had large pink, purple bruises on both buttocks, three and three quarters to four inches in dimension. He explained that bruising on the buttocks is an "unusual location" if accidental. Accidental bruising is commonly found on boney outcrops of the body like the knee, elbow, or shin. Dr. Tashjian observed a hand pattern contusion on the right leg and explained that the object that made contact with the leg, left its impression on the leg suggesting considerable force. The victim also had a bruise on her inner left thigh, which is not a common location for bruises in small children. The victim also had a bruise on top of the left shoulder and smaller and fainter contusions on the front and side of the shoulder.

Regarding the bruises on the victim's face, Dr. Tashjian explained that she had bruising and swelling of the tissues around both eyes commonly known as a "black eye," and a red and purple bruise on the chin. The bruise on her chin was not "a scrape on the surface" like a rug burn, but the result of bleeding into the soft tissue. The victim had several small bruises and scrapes on her left cheek, the upper lip, and the front of her left ear. She had another hand pattern contusion on the right cheek that was similar to the one on her right leg but less distinctive. She also had smaller areas of bruises and scrapes, and a possible contusion on the back of the right ear which was an "unusual location for a bruise." Dr. Tashjian was aware that a cervical collar was used to stabilize the victim's neck for the craniectomy, and the contusion behind the right ear may have been connected to that procedure. However, Dr. Tashjian was confident that the injuries on the right side of the victim's face were not due to medical intervention. He acknowledged that the injuries on the left side of the face were "more ambiguous" because of the surgical incision on that side of the face for the craniectomy. He rejected a scenario where the bruises on the sides of the face could have been caused by a medical professional stabilizing the neck by hand.

Dr. Deborah Lowen was the lead child abuse pediatrician on the care team at Vanderbilt. Dr. Lowen spoke to the tending physicians and examined the treatment reports from Saint Thomas and Vanderbilt, the photographs of the victim while under treatment, and her autopsy photographs. A CT scan revealed the victim sustained a massive, life-threatening brain swelling which required a craniectomy, the removal of the skull to drain the blood found in the tissue between the skull and the brain and to reduce the swelling of the brain. Dr. Lowen explained that when the brain swells, it cuts off the blood vessels

causing further injury to an already injured brain.  The swelling in this case was so immense that the surgeons were unable to close the bone flap over the brain.  Dr. Lowen testified that she had "never" been involved in a case where the swelling was so extreme that the bone flap would not cover the swollen brain.  According to Dr. Lowen, this was the "worse possible" case of subdural hemorrhage and brain swelling she had ever observed.  There was blood and swelling on both sides of the brain but there was more blood and swelling on the left side, so much so that the swelling "pushed the internal structures" to the right.  Dr. Lowen determined that the victim had suffered "severe child physical abuse including abusive head trauma."  In terms of when the injury occurred, Dr. Lowen explained that studies have shown that children who sustain such injuries are "symptomatic immediately."  The progression of the victim's symptoms "from sobbing with eyes open, nonresponsive to going unconscious, to going limp, to starting to have seizures" was a "textbook" case of symptoms of such a severe injury.  Maximum medical and surgical intervention did not decrease the swelling of the brain.  Dr. Lowen testified that the intercranial pressure and brain swelling were not survivable, and therefore caused the victim's death.

In terms of the victim's ocular injuries, Dr. Lowen testified that the victim's retinoschisis was on the "severe end of the spectrum" and consistent with the "severity of the intracranial" pressure.  She testified that the "only accidental mechanism" for such an extreme finding of retinoschisis would be a "severe crush injury[,]" where a child has pulled a large piece of furniture over his or her head.  Dr. Lowen testified further that "in no realm" would the combination of the victim's head injury and retinoschisis result from a "short fall off a stool."  Dr. Lowen's findings mirrored Dr. Tashjian's testimony regarding the remainder of the victim's injuries.  Dr. Lowen denied that life-saving measures such as CPR would have caused the injuries sustained by the victim.

Based on this evidence, the jury convicted Defendant of felony murder in the commission of aggravated child abuse (count one), felony murder in the commission of aggravated child neglect (count two), two counts of aggravated child abuse (counts three and five), aggravated child neglect (count six), two counts of child abuse (counts seven and eight), and one count of reckless endangerment, a lesser-included offense of aggravated child abuse as charged in count four.  The jury found Defendant not guilty of child abuse as charged in count nine.

At sentencing, the State introduced Defendant's presentence report and copies of Defendant's prior convictions in Davidson County and Williamson County.  The victim's grandmother made a statement.  After hearing the arguments of the parties, the trial court took the matter under advisement and subsequently issued a written memorandum of its sentencing decision.  In determining Defendant's sentence, the trial court considered the evidence at trial and sentencing including Defendant's presentence report and the victim's family impact statement, and the principles of sentencing.

First, the trial court found Defendant qualified as a Range II offender based on three prior felony convictions, namely, theft over $2,500, theft over $10,000, and aggravated burglary. Accordingly, Defendant was sentenced as a Range II offender to counts three, five, six, seven, and eight. Next, the trial court found and applied five enhancement factors. The trial court found Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the proper range (1); the victim was particularly vulnerable due to her age, physical, or mental disability (4); Defendant treated the victim with exceptional cruelty during the commission of the offenses (5); the personal injuries inflicted upon the victim were particularly great (6); and Defendant abused a position of private trust (14). *See* T.C.A. § 40-35-114(1), (4), (5), (6), (14). The trial court applied factors (1), (4), and (14) to all counts; applied factor (5) to counts one, three, five, seven, and eight; and applied factor (6) to counts seven and eight only. The trial court found no mitigating factors.

The trial court sentenced Defendant to life imprisonment for counts one and two and merged those counts. The court then sentenced Defendant for counts three, five, and six to forty years, eight years for counts seven and eight, and eleven months, twenty-nine days for count four. On the issue of sentence alignment, the trial court made the following findings:

> [] Defendant is a professional criminal who has knowingly devoted his life to criminal acts as a major source of his livelihood, in that [Defendant] admittedly engaged in drug transactions as a financial source during the course of events on the day of [the victim]'s death. Additionally, [Defendant] has significant convictions in his criminal history for aggravated burglary and felony and misdemeanor theft, criminal offenses indicative of conduct as a major source of livelihood.

> [] Defendant is an offender whose record of criminal activity is extensive, in that [Defendant] has prior criminal convictions for aggravated burglary and felony and misdemeanor theft.

> [] Defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high, in that, based on evidence presented at trial, [Defendant]'s conduct of abuse and neglect resulted in the death of [the victim]. In applying this factor, the [c]ourt considers the severity of [the victim]'s injuries and the failure on the part of [Defendant] to timely seek medical attention.

The trial court then made the requisite additional findings to support its conclusion that Defendant was a dangerous offender and imposed partial consecutive sentences:

> The [c]ourt acknowledges [Defendant]'s contention that he did not seek medical attention at the direction of [the victim]'s mother. However, the [c]ourt notes that while [the victim] suffered as a result of severe injuries found by the jury to have been inflicted by [Defendant], (sic) failed to seek critical medical attention. The [c]ourt further notes that while [the] three-year-old [victim] was in the care of the Defendant he cavalierly engaged in unlawful drug transactions. [Defendant] clearly exercised poor judgment as he was entrusted with the care of [the victim]. In considering [Defendant]'s prior criminal record and the serious nature and circumstances surrounding the abuse and death of [the victim], the [c]ourt finds that consecutive sentencing in the instant case reasonably relates to the severity of the offenses and [is] necessary to protect the public from further criminal conduct by [Defendant]. Therefore, the [c]ourt orders that counts [one] and [two] shall merge. The [c]ourt further orders that counts [three], [five] and [six] shall be served concurrently with each other, but consecutively to merged counts [one] and [two]. The [court] further orders that count [four] shall be served concurrently with merged counts [one] and [two]. The [c]ourt further orders that counts [seven] and [eight] be served concurrently with each other, but consecutively to counts [three], [five], and [six], for an effective sentence of life plus forty-eight (48) years.

The trial court denied Defendant's motion for new trial and Defendant filed a timely appeal.

## Analysis

### I.     *Election of Offenses*

Defendant claims the trial court erred in failing to compel the State to make an election of offenses at the close of the State's case-in-chief. The State contends that its election during closing argument rendered its failure to elect at the close of its case-in-chief harmless beyond a reasonable doubt.

The "first question" this court must address in this and every issue on appeal is "what is the appropriate standard of review?" *State v. Enix*, 653 S.W.3d 692, 698 (Tenn. 2022). As Defendant contends, and the State concedes, the record shows that no election was made at the close of the State's case-in-chief. However, the record also shows that although Defendant raised the error as an issue in his motion for new trial, he failed to raise

the issue at trial. In the motion for new trial, Defendant admits the failure to object at trial but makes no mention of this omission on appeal.

Because Defendant failed to object at trial but raised the issue in the motion for new trial, we are limited in reviewing this issue, if at all, for plain error. *See id.* at 700-01 (holding "plain error review is the appropriate standard of review to apply to claims of alleged prosecutorial misconduct during closing argument when no contemporaneous objection was lodged at the time of the alleged misconduct but the claim is raised in the motion for a new trial").

Neither party has, however, addressed this issue for plain error. "[A] party seeking plain error relief must generally raise and argue the issue in the party's briefing, just as the party would do with all other issues in the ordinary course of an appeal." *State v. Funk*, No. E2022-01367-CCA-R3-CD, 2023 WL 7130289, at *3 (Tenn. Crim. App. Oct. 30, 2023), *no perm. app. filed*. Accordingly, "where a defendant fails to respond to a waiver argument, only particularly compelling or egregious circumstances could typically justify our sua sponte consideration of plain error relief." *State v. Thompson*, No. W2022-01535-CCA-R3-CD, 2023 WL 4552193, at *5 (Tenn. Crim. App. July 14, 2023), *no perm. app. filed*; *see State v. Sullivan*, No. E2022-00962-CCA-R3-CD, 2024 WL 268794, at *16 (Tenn. Crim. App. Jan. 24, 2024) (declining to review defendant's Rule 404(b) issue for plain error where defendant failed to raise objection at trial, asserted the issue in an amended motion for new trial, failed to ask for plain error review on appeal, and no egregious or compelling reasons justified the court's review on appeal), *no perm. app. filed*.[1]

Because the right to a unanimous verdict has been recognized by our Supreme Court as "fundamental, immediately touching on the constitutional rights of an accused" and the election of offenses is dispositive of six of Defendant's convictions, we find the circumstances compelling and choose to exercise our discretion to review for plain error. *State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000) (quoting *Burlison v. State*, 501 S.W.2d 801, 804 (Tenn. 1973)).

Under plain error review, relief will only be granted when five prerequisites are met: (1) the record clearly establishes what occurred in the trial court, (2) a clear and unequivocal rule of law was breached, (3) a substantial right of the accused was adversely affected, (4) the accused did not waive the issue for tactical reasons, and (5) consideration of the error is necessary to do substantial justice. *State v. Rimmer*, 623 S.W.3d 235, 255-56 (Tenn. 2021) (citing *State v. Martin*, 505 S.W.3d 492, 504 (Tenn. 2016)). If any one of

---

[1] At the time of the filing of this opinion, a Rule 11 application had not been filed.

these factors is not satisfied, we do not need to consider the remaining factors.  *State v. Smith*, 492 S.W.3d 224, 232 (Tenn. 2016).

The right to a jury trial requires that a jury's verdict be unanimous.  Tenn. Const. art. I, § 6; U.S. Const. amend. VI, XIV; *see State v. Kendrick*, 38 S.W.3d 566, 568 (Tenn. 2001); *Ramos v. Louisiana*, 140 S. Ct. 1390, 1396-97 (2020).  A unanimous verdict means that all twelve jurors unanimously agreed that the defendant committed the particular criminal act charged.  *Kendrick*, 38 S.W.3d at 568.  "The election doctrine refers to the prosecutor's duty in a case where evidence of multiple separate incidents is introduced to elect for each count charged the specific incident on which the jury should deliberate to determine the defendant's guilt."  *State v. Qualls*, 482 S.W.3d 1, 9 (Tenn. 2016).

Election is required when the charged offense consists of a discrete act, yet the proof is introduced in a series of acts.  *Adams*, 24 S.W.3d at 294.  Conversely, election is not invoked when the nature of the charged offense is a continuing course of conduct, because the offense by definition, constitutes a single offense.  *Id.* at 295-97 (holding that because child neglect is a continuing offense, the State was not required to make an election of offenses).

Generally, election is often implicated in cases of sexual offenses against children due to the difficulty the victim may have in remembering the specifics of each offense.  *See State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Shelton*, 851 S.W.2d 134, 136 (Tenn. 1993); *State v. Rickman*, 876 S.W.2d 824, 829 (Tenn. 1994).  Election is not limited to child sex abuse cases and has been required for other types of offenses.  *Smith*, 492 S.W.3d at 234-36 (finding plain error in failing to elect offenses among three incidents on a charge of aggravated assault); *State v. Bagwell*, No. M2014-00017-CCA-R3-CD, 2015 WL 721069, at *7-8 (Tenn. Crim. App. Feb. 19, 2015) (affirming convictions for two counts of attempted murder and two counts of aggravated assault where the State "effectively elected [in its closing argument]" to distinguish the attempted murder charges from the aggravated assault charges); *State v. Yancey*, No. W2011-01543-CCA-R3-CD, 2012 WL 4057369, at *6-9 (Tenn. Crim. App. Sept. 17, 2012) (finding plain error where the State failed to elect the dangerous felony for employing a firearm offense where neither indictment nor jury instruction specified the dangerous felony).

The election requirement supplements the general unanimity instruction "to ensure that the jury understands its obligation to agree unanimously that the defendant committed the same criminal act before it may convict the defendant of a criminal offense."  *Qualls*, 482 S.W.3d at 10.  "There is no right to a perfect election, and . . . the election requirement may be satisfied in a variety of ways."  *State v. Knowles*, 470 S.W.3d 416, 424 (Tenn. 2015).  Importantly, "the election requirement applies to offenses, not to the facts supporting each element of the offense."  *Id.*  If the election doctrine is invoked, the State

must make its election at the conclusion of its case-in-chief. *Qualls*, 482 S.W.3d at 10 (citing *Rickman*, 876 S.W.2d at 828).

"[E]lection errors are subject to a constitutional harmless error analysis." *Smith*, 492 S.W.3d at 236; *Qualls*, 482 S.W.3d at 17-20 (applying constitutional harmless error analysis to assess election error). "The test used to determine whether a non-structural constitutional error is harmless is whether it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008) (quotations omitted).

While a prosecutor's closing argument cannot "cure" the failure to elect offenses or serve as an "effective substitute," this court may consider a prosecutor's statements in closing argument as part of a constitutional harmless error analysis. *Smith*, 492 S.W.3d at 237. When an election issue is properly preserved, it is reviewed de novo with no presumption of correctness. *Qualls*, 482 S.W.3d at 8.

First, as the State correctly notes, election was not required for felony murder by aggravated child neglect (count two) and aggravated child neglect (count six) because child neglect is an ongoing continuous conduct constituting one offense. *See Adams*, 24 S.W.3d at 295-97. Moreover, the jury acquitted Defendant of count nine. We therefore focus our attention to the remaining counts of the indictment: count one, felony murder by aggravated child abuse; counts three, four, and five, aggravated child abuse; and counts seven and eight, child abuse.

Here, the record shows that Defendant was charged with aggravated child abuse in counts three, four, and five; and child abuse in counts seven, eight, and nine. "A person commits the offense of aggravated child abuse . . . who commits child abuse, as defined in § 39-15-401(a) . . . and: (1) The act of abuse . . . results in serious bodily injury to the child." T.C.A. § 39-15-402(a)(1).

> "Serious bodily injury to the child" includes, but is not limited to, second- or third-degree burns, a fracture of any bone, a concussion, subdural or subarachnoid bleeding, retinal hemorrhage, cerebral edema, brain contusion, injuries to the skin that involve severe bruising or the likelihood of permanent or protracted disfigurement, including those sustained by whipping children with objects and acts of female genital mutilation as defined in § 39-13-110.

*Id.* § 39-15-402(c). Child abuse occurs when "[a]ny person . . . knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury[.]" *Id.* § 39-15-401(a).

- 13 -

The indictment in this case does not specify the abuse or the injuries for the counts in question. No election was made by the State at the close of its proof. The record shows instead that the State elected the facts during its closing argument:

> Count Three is Aggravated Child Abuse and it refers to the head/brain trauma that the victim suffered. Count Four is Aggravated Child Abuse and it refers to the clavicle fracture. Count Five is Aggravated Child Abuse and it refers to the severe buttocks bruising. Count Six is Aggravated Child Neglect. Aggravated Child Neglect, it was an ongoing offense, continuing course of conduct. I am going to explain that to you a little bit later in this argument. Count Seven is the pattern bruise on the leg. Count Eight is the bruising on the face, right side of the face. And Count Nine is the bruising on the left arm.

> So[,] this is what I am talking about when we are talking about Felony Murder. For Count Three, Aggravated Child Abuse, alleging the head/brain trauma that [the victim] suffered that you heard evidence of in this courtroom this week, that is what fosters that. If you find [D]efendant guilty of Aggravated Child Abuse for the head and brain trauma that is what refers to the Felony Murder in Count One, that refers back to that.

> Same thing here. Count Six, the Aggravated Child Neglect it's an ongoing offense. It includes everything that happened. It includes the brain injury. If you find [D]efendant guilty of that that is what Count Two, Felony Murder, refers to. That's how those work. That's how those go together. So, Counts One and Three and Counts Two and Six.

Additionally, the State used a demonstrative aid, included in the record, showing the specific injury related to each count.

Of the convictions germane to this issue, Defendant was convicted as charged in counts one and three, the brain swelling injury; count five, bruises on both buttocks; count seven, the handprint pattern contusion on the right calf; and count eight, bruising on the right side of the face. The jury convicted Defendant of the lesser-included offense of reckless endangerment in count four, the fractured clavicle; and found him not guilty of child abuse in count nine, bruising on the left arm.

Upon our review of the record, we conclude that any error in the State's failure to elect the offenses at the close of the State's proof was harmless beyond a reasonable doubt. In this case, the State pursued separate convictions based on separate injuries. The State differentiated the three counts of aggravated child abuse and the three counts of child abuse

- 14 -

by referencing the specific injuries inflicted upon the victim. The State directed the jury's attention to a particular set of facts for each count of the indictment. For instance, in count three, the State identified the intercranial pressure and brain swelling. The jury was not tasked with considering other injuries such as the fractured clavicle or the buttocks bruising when rendering a verdict on count three. Based on the State's election, the jury either accredited the evidence of the victim's injury of brain trauma and Defendant's culpability for it, or it did not. Or put another way, no set of facts in each count would also support the conviction in another count.

Moreover, the jury's decision to convict Defendant of the lesser-included offense of reckless endangerment in count four regarding the fractured clavicle and to acquit Defendant of count nine regarding the bruising on the left arm bolsters our conclusion that the jury deliberated on a single instance of alleged criminal conduct on each count to ensure a unanimous verdict. The State's election during closing argument combined with the trial court's unanimity instruction demonstrates that Defendant's right to a unanimous verdict was not adversely affected, and consideration of any error is not necessary to do substantial justice. Thus, Defendant is not entitled to relief.

## II.   Consecutive Sentencing

Defendant claims the trial court abused its discretion in ordering consecutive alignment of his sentences; however, in his brief, he makes no argument to support his claim, stating only that the three factors found by the trial court were "against the evidence on the record." The State contends the record supports the trial court's decision to order partial consecutive sentencing. We agree with the State.

This court reviews a trial court's decision on consecutive sentencing under an abuse of discretion standard with a presumption of reasonableness. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). The presumption of reasonableness applies where a trial court "properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review[.]" *Id.* The trial court has the discretion to order consecutive alignment of multiple sentences if it finds by a preponderance of the evidence one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b). In this case, the trial court found three factors: Defendant was a professional criminal who has knowingly devoted his life to criminal acts as a major source of livelihood; Defendant was an offender whose record of criminal activity was extensive; and Defendant was a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. *See* T.C.A. § 40-35-115(b)(1), (2), (4).

- 15 -

Without argument and citation to the record, Defendant simply concludes that the trial court's findings are not supported by the evidence. Unlike Defendant, the trial court articulated its reasons for ordering consecutive sentences, identified the sources for its decision, and followed proper sentencing procedure thereby providing a basis for meaningful appellate review. The trial court's reasons are supported by the record and consistent with the principles and purposes of sentencing.

The record shows that Defendant had a record of extensive criminal activity which he relied on as a major source of his livelihood. According to the presentence report, Defendant had two prior convictions for theft over $1,000, one prior conviction for theft over $10,000, one prior conviction for aggravated burglary, one prior conviction for possession of a prohibited weapon, and one prior conviction for casual exchange. *State v. Perry*, 656 S.W.3d 116, 131 (Tenn. 2022) (reiterating that prior convictions "provide some stronger measure of justification" for finding that a defendant's record of criminal activity is extensive). At trial, Defendant admitted that his theft convictions stemmed from "paying people for stolen property and then selling it for a profit." He also admitted that he conducted multiple drug sales while caring for the victim. *See id.* (clarifying that a defendant does not need to have prior convictions to qualify as an offender with a record of extensive criminal activity). There was no testimony that he was gainfully employed at the time of the crimes, and the employment history section of the presentence report could not be verified further supporting the trial court's application of factor (2).

Finally, the record supports the trial court's finding that Defendant was a dangerous offender. The medical evidence shows that Defendant engaged in behavior resulting in one of the worst cases of brain swelling and subdural hemorrhaging that Dr. Lowen, the child abuse pediatrician, had seen in her lengthy career. All the medical experts agreed that the victim had no chance of surviving this brain injury. The fact that Defendant had no hesitation in engaging in an activity recognized as dangerous while caring for a three-year-old child supports the trial court's finding that Defendant was a dangerous offender under Tennessee Code Annotated section 40-35-115(b)(6). Discerning no error in the trial court's sentencing decision to impose partial consecutive sentences, we reject Defendant's complaint for relief and affirm the sentence.

## Conclusion

For the foregoing reasons, we affirm the judgments of the trial court.

_____
JILL BARTEE AYERS, JUDGE