IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 13, 2026 Session

**CARRINGTON OWENS v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Montgomery County**
**No. 2016-CR-497    William R. Goodman, III, Judge**

———————————————————

**No. M2024-01450-CCA-R3-PC**

———————————————————

Carrington Owens, Petitioner, appeals from the denial of post-conviction relief from Petitioner's convictions for four counts of rape of a child, twenty-three counts of especially aggravated sexual exploitation of a minor, and twelve counts of aggravated sexual battery of a child less than thirteen years of age and his effective thirty-seven-year sentence.  On appeal, Petitioner contends that the post-conviction court erred by denying relief on his ineffective assistance of counsel claims.  Discerning no error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER and JILL BARTEE AYERS, JJ., joined.

Joshua L. Brand, Nashville, Tennessee, for the appellant, Carrington Owens.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Robert J. Nash, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

A Montgomery County jury convicted Petitioner of thirty-nine counts of sexual offenses involving his biological daughter ("the younger victim") with his fiancée Rachel and Rachel's daughter from another relationship ("the older victim").[1]  The victim in the

---

[1] It is the policy of this court to protect the identity of minor victims.  In furtherance of that policy, we will use the first name of the minor victims' mother.  We intend no disrespect in doing so.

four counts of rape of a child was the older victim. The other thirty-five counts named either one or both of the victims. The older victim was fourteen years old when she testified at the trial about the abuse that began when she was six or seven. The younger victim was approximately eighteen months old when the abuse began. Rachel was charged as a co-defendant, but her case was severed, and Petitioner was tried separately.

At the trial, the State introduced thirty-one photographic images that had been recovered from Petitioner's computer following the execution of a search warrant at Petitioner's apartment. The older victim testified and identified Petitioner in some of the images. Petitioner's convictions were affirmed in his direct appeal, in which he did not challenge the sufficiency of the evidence. *State v. Owens*, No. M2018-01830-CCA-R3-CD, 2020 WL 1130667, at *1 (Tenn. Crim. App. Mar. 9, 2020), *perm. app. denied* (Tenn. June 3, 2020).

## Post-Conviction Petitions

Petitioner filed a timely pro se petition for post-conviction relief and four amended petitions alleging numerous claims of ineffective assistance of counsel. For purposes of this appeal, Petitioner preserved three issues for review. He claims that trial counsel failed to effectively present a defense, failed to request the appropriate jury instruction under *State v. Qualls*, 482 S.W.3d 1 (Tenn. 2016), and failed to effectively request a new trial when he was made aware of text messages that demonstrated two witnesses in the trial allegedly committed perjury.[2]

## Post-Conviction Hearing

Tennessee Bureau of Investigation ("TBI") Special Agent Nicholas Christian testified that he was head of TBI Cyber Com Investigation Squad, which investigates "transnational cyber-crime organizations." Agent Christian previously worked as a TBI digital forensic examiner extracting data from phones, laptops, or other devices. Agent Christian became involved in Petitioner's case after the TBI executed a search warrant at Petitioner's apartment. The warrant was based on information that the I.P. address associated with Petitioner's computer had been used to download "child exploitation materials." In Petitioner's case, he extracted hundreds of images from six devices, including an HP Pro Book, 4530 laptop computer registered to "Care Bear," and a Toshiba internal 2.5-inch hard drive registered to "Rachel."[3] Many of the images depicted

---

[2] Because the stepmother has the same last name as the older victim, we will refer to her as "stepmother."

[3] The older victim testified that "Care Bear" was a nickname for Petitioner. Rachel was the first name of her mother.

Petitioner, Rachel, and the two victims "nude or engaged in sexual activity." Other images depicted sexual abuse of unknown children. Most images were created on November 3, 2010, November 13, 2011, and December 31, 2013. Thirty-one images were introduced as evidence at trial, including images of a nude male, a young female child and an older female child. Some pictures show the victims in the bathtub touching a penis. Another picture showed a penis in the older victim's mouth.

Because the images admitted at trial did not show Petitioner's face, much of the examination of Agent Christian at the post-conviction hearing related to Agent Christian's trial testimony concerning a penis shown in certain images. Post-conviction counsel asked Agent Christian if he recalled being asked by trial counsel during cross-examination "whether or not the penis in some photos was the same penis as in the comparison photos [of Petitioner]." Agent Christian explained that the State provided the comparison images so that the trier of fact could "make that determination on their own." Agent Christian explained that the comparison images "are not only digitally comparable, but comparable to the person that's in the photo or the background of the photo."

On cross-examination by the State at the post-conviction hearing, Agent Christian stated that he did not recall opining that the penis shown in the photographs was Petitioner's penis. On redirect examination by post-conviction counsel, Agent Christian was asked to read the following excerpt of trial counsel's cross-examination at the trial:

TRIAL COUNSEL: Just talk about the [bathtub] pictures for a moment. You don't know whose penis it is in those bathtub pictures, correct?

AGENT CHRISTIAN: Well, using the comparison images that's my assumption that it is.

TRIAL COUNSEL: So you're making an assumption that it is [Petitioner]'s penis in those pictures?

AGENT CHRISTIAN: Well, it is my expert opinion that it is.

Agent Christian agreed that he did not have any specialized training "in the medical sense or the human anatomy sense" to say, "These two are the same penises." However, he explained that "comparing two images or comparing what's in the images [is what] we do daily," especially on child sexual abuse imagery. Agent Christian said that he had specialized training in how to identify the victims or the people in the photographs, where those photos could have been taken, and when they were taken. He said one comparison photograph showed a "completely nude male with his penis exposed." He used the

comparison images in reaching his opinion that the penis shown in a victim's hand in one image and mouth in another image was Petitioner's.

Agent Christian said several images extracted from Petitioner's computer showed Rachel and the victims. In some images the two victims are shown in a bathtub facing each other and spreading their vagina. Another image showed two adult females exposing their breasts and a nude juvenile female. One image showed a pre-pubescent female touching an object to her vagina. He said the pictures of Rachel and the victims were not introduced at Petitioner's trial.

Trial counsel testified that he had been practicing law for eighteen years focusing on criminal law and family law. He said that he had previously represented defendants in cases involving rape of a child and child pornography. Petitioner retained his services after the search warrant was executed but before Petitioner was charged by direct presentment. Based on the search warrant affidavit and Petitioner's assurance "that there was no child porn" on any electronic devices, counsel initially thought the case involved downloaded adult pornography. He said that Petitioner told him the TBI was "not going to find anything" and that "[t]his is going to go away." Counsel said that he did not know the seriousness of the case until the presentment was returned.

Trial counsel said that he knew Rachel and the two children had moved to New Hampshire and that there was a custody proceeding filed there. He said that Petitioner brought documents from the custody proceeding for him to review and that he talked with an attorney in New Hampshire. Counsel learned that the older victim had "made some admissions to a therapist" in New Hampshire and that authorities there had started an investigation.

Concerning his trial strategy, trial counsel explained:

[Petitioner's] only real defense was to keep the pictures from coming into evidence at trial. [Petitioner] had documented raping these children and kept it for seven years on a hard drive in his house. He was definitely in possession of pictures of him raping these children.

So I knew if a jury got to see those pictures that were [o]n his hard drive, that he would likely get convicted. [Petitioner] knew that.

Trial counsel stated that there were no pictures of the victims' being raped that clearly showed Petitioner's face. Counsel explained that the predicament he faced at the suppression hearing and at trial was basically arguing that Rachel "had somebody else rape her children, took pictures of it, put it on [Petitioner's] hard drive, and [Petitioner] kept it

4

for four or five years[.]"  Counsel also said his strategy was limited because Petitioner "never once . . . said, 'That's not me raping these children.'"

After the trial court denied the motion to suppress, trial counsel was forced to change his trial strategy to attempt to show that Rachel had somehow "manipulated" the older victim's testimony.  He hoped to create doubt that Petitioner was the person shown raping the older victim.  Trial counsel thought he had no choice but to admit in his opening statement that the victims had been raped or sexually abused to maintain his credibility with the jury.

Trial counsel explained that during cross-examination, Agent Christian, in a nonresponsive answer to a leading question, stated that he was assuming the penis in an image was Petitioner's penis.  He said that, rather than object, he asked the agent a follow-up question to clarify that Agent Christian was only assuming that it was Petitioner's penis and that Agent Christian responded that it was his expert opinion that it was Petitioner's penis.  Trial counsel stated that the older victim testified that the penis in the images was Petitioner's penis.

Trial counsel acknowledged that some of the images on Petitioner's computer had been taken by Rachel and that her face could be seen in some of the photographs.  In some images a pre-pubescent female can be seen grabbing a woman's breast.  In another image, a pre-pubescent female can be seen with her mouth on the woman's breast.  Counsel said that he decided not to introduce those photographs or images of child pornography involving these unknown victims that were found on Petitioner's computer because he felt they could be harmful to Petitioner's defense.

Trial counsel said that he questioned the older victim about whether Rachel had molested her.  He said that he expected the victim to tell the truth and answer, "yes," but she testified, "no."  The older victim also denied having contact with Rachel.  Counsel believed that the victim's "credibility was hurt" when she lied about Rachel's involvement.  Counsel called the older victim's stepmother to establish that Rachel had unauthorized contact with the victim, but the stepmother lied and denied knowing about any contact.  Counsel hoped that the jury would decide the testimony was untrue and that it undermined the older victim's and the stepmother's testimony.

Trial counsel testified that the State introduced a photograph to coincide and corroborate each count of the indictment.  He said that four photographs showed Petitioner raping the older victim.

Post-conviction counsel showed trial counsel a series of text messages between Rachel and the stepmother sent between November 2017 and July 2018.  A few of the

5

messages appear to be from the older victim, basically telling Rachel that she loves her and misses her. Trial counsel said that he did not believe he had the text prior to trial or before the hearing on the motion for new trial. After reviewing the text messages, he said that it looked as if Rachel was telling the victim to tell the truth at trial and assuring the victim that she was not in trouble.

Our review reflects that many of the text messages show that the older victim was scared about having to testify at Petitioner's trial and that Rachel wanted the stepmother to assure her that "she won't get in trouble" and to explain that "all she has to do is tell the truth." In other texts, Rachel discusses meeting the older victim at the YMCA and wanting to see the older victim at Thanksgiving. In several texts, the stepmother asks Rachel to bring money. In other texts, the stepmother says the older victim was not coping well, was complaining about doing household chores, and had been lying to her.

Trial counsel said the State offered a twenty-five-year plea deal at 100% service. He said he tried to talk Petitioner into taking the offer, but Petitioner refused, stating that the sentence was too long and that he would die in prison if he accepted the agreement.

Former Judge Mark Fishburn was qualified as an expert in criminal trial practice and criminal advocacy. Judge Fishburn opined that trial counsel had a "reasonable" trial strategy by attempting to show that the older victim was lying and that Rachel "was manipulating and controlling this thing." Judge Fishburn testified that, under the circumstances, there were not "a whole lot of other avenues to pursue." Judge Fishburn stated that "having a strategy" and having a "plan to effectuate it are two entirely different things." He opined that trial counsel was not prepared to attack the older victim's credibility and characterized trial counsel's cross-examination of the older victim as "tip toeing [sic] through the tulips." Judge Fishburn opined that trial counsel was deficient in his cross-examination of the older victim.

Based on the older victim's pretrial forensic interview, Judge Fishburn said that trial counsel should have anticipated and been prepared for the older victim not to implicate Rachel. He said that trial counsel should have obtained a certified copy of the guardian ad litem letter from New Hampshire to use to impeach the older victim's testimony by showing that the older victim had been in contact with Rachel. Judge Fishburn opined that because trial counsel did not adequately prepare for the trial, there was no evidence introduced as to "the possible motive" for the older victim to lie and no evidence to show the older victim was manipulated by Rachel.

Judge Fishburn also opined that trial counsel was deficient in his cross-examination of Agent Christian. He characterized counsel's question about what Agent Christian assumed as "open-ended" and said counsel should have been more careful in his

6

questioning or at least been prepared to object if Agent Christian tried to give an expert opinion about whose penis was shown in the images.

Judge Fishburn explained that *Qualls* provides:

that in those situations where you're going to have testimony that's very nebulous as to time, and place, and things of this nature, that you can have the modified unanimity of a verdict, in which the jury simply has to find beyond a reasonable doubt that all of the acts alleged occurred within the time frame stated in the indictment.

Judge Fishburn opined that the *Qualls* instruction was important to show that the victims were not with Petitioner during some of the time period covered by the indictment. He also stated that the instruction was important because the photographs did not show when the depicted events occurred.

Judge Fishburn opined that trial counsel was deficient for failing to introduce "sexually graphic photographs" of the victims with Rachel because the photographs would have gone to the older victim's credibility. Judge Fishburn noted that Agent Christian had testified that there was a photograph of the nude older victim grabbing a woman's breast and another photograph with the older victim's mouth on the woman's breast.

Judge Fishburn said the "text messages were gold" because they undermined the credibility of the older victim and the stepmother. He said that they showed "a conspiracy" of the older victim, Rachel, and the stepmother communicating with each other and hiding it from Petitioner. He said that trial counsel's "lack of effort put in to support the strategy that he employed is where the deficiency lies."

Assistant District Attorney Kimberly Lund, the prosecutor in Petitioner's trial, was called as a witness by Petitioner. Post-conviction counsel asked General Lund to review a binder marked "text messages." After looking at the messages, General Lund acknowledged they were found by post-conviction counsel in her file but that she did "not know where they came from," "who gave them to [her]," or "when they were given to [her]." She said that "[t]hey were in the box" and that she did not "know when they were given to [her] and put in the box."

In the examination by the State, General Lund was asked about "the *Qualls* discussion." She said that she "brought up the *Qualls* issue" with the trial court "because she was not sure whether the victim would be able to provide a timeframe." General Lund said that the older victim testified that the abuse happened while they were living in Clarksville and that it "started when she was approximately six years old, and it continued

7

until she moved to New Hampshire." General Lund said that Rachel and the two victims moved out of the residence in November 2012. The older victim testified that "the abuse "happened a little bit before [Petitioner] was deployed, mostly when he came back." General Lund said that because she "had that timeframe and a venue," she did not "feel like it was necessary to have a blended instruction anymore."

General Lund testified that the older victim never implicated Rachel during her forensic interview, at trial, or at any time of which she was aware. She said that the older victim denied that she had been abused by a boyfriend of Rachel, a neighbor, or a relative. Concerning the abuse, General Lund testified the older victim said that "[m]y mom didn't do anything. She didn't touch me." When asked if she was worried about the older victim committing perjury or suborning perjury herself, General Lund answered:

> No, I'm not suborning perjury. [Petitioner] was on trial and the questions are: "Whose penis is in your mouth? Whose penis is in your hand? Whose penis is in your sister's hand?"

> It's [Petitioner's]. It's Care Bear. It's Carrie.[4] I was six years old. I'm in Clarksville. My mom is not around. There's no other dude. It's him.

Concerning the older victim's testimony, General Lund stated that her "experience with crimes against children is [that] no matter what a parent does to a kid, it doesn't matter how bad it is, they always love . . . their parent." General Lund explained that the older victim "thought she was disclosing sex abuse by a man," but we "swoop in and we're like, 'Oh, by the way, we think your mom did it too. Now you can't have contact with her.'" General Lund explained that the older victim "loved [Rachel] and would have done anything to be with [Rachel], because that's the only person she had." General Lund stated that the older victim's "whole world was shattered because she disclosed that she had been a victim."

### Order Denying Post-Conviction Relief

The post-conviction court issued an extensive written order addressing the following issues:[5]

---

[4] Carrie was another nickname for Petitioner. Carrie is the spelling used in the trial transcript, and we will use that spelling in this opinion even though in the trial court's order it is spelled Cary.

[5] Only Issues 3, 5, 6, and 7 were raised on appeal and Issues 3 and 5 were consolidated into one issue on appeal.

8

1. Trial counsel was ineffective by failing to adequately and properly challenge the search warrant used to collect much of the evidence in the case, specifically as it relates to the insufficient probable cause contained in the search warrant.

2. Trial counsel was ineffective for failing to allow Petitioner to personally review the discovery in this case.

3. Trial Counsel was ineffective for failing to thoroughly and effectively cross-examine the victim-witness in the case, including by failing to utilize available impeachment evidence.

4. Trial counsel failed to object to hearsay from Detective Lambert and [by] allowing him to testify to material, inadmissible evidence.

5. Trial counsel improperly and negligently elicited testimony from Special Agent Nicholas Christian that in his opinion it was Petitioner's penis that appeared in certain photos.

6. Trial counsel was ineffective for failing to object to improper jury instructions under *State v. Qualls*, 482 S.W.3d 1 (Tenn. 20[1]6), that require a modified unanimity instruction if there is no election of offenses.

7. Petitioner's Due Process Rights under the U.S. Constitution and Tennessee Constitution were violated for failure to disclose exculpatory evidence relating to communications between . . . Rachel . . . and [the stepmother] that would have provided significant impeachment evidence, as well as substantiated Petitioner's defense.

Concerning the claim that trial counsel was deficient in his cross-examination of the older victim (Issue 3), the post-conviction court noted that the older victim was admonished by the State during direct examination to tell the truth. The older victim testified "that Petitioner started touching her inappropriately when she was around five or six, touching her in what she described as her 'girl spot.'" The older victim identified a photograph "introduced at trial as exhibit 22, in which she identified herself holding a male's penis, exhibit 25 in which she is nude, and exhibit 27, in which she is nude with her mouth in the groin area of a male she identifies a 'Carr[ie].'" The court found that, when the older victim was asked about Rachel, she said that she was not allowed to see Rachel but that "she would see her at the 'Y.'" She testified that "she loved [Rachel] and that she missed her . . . ." She denied that Rachel told "her what to say or to make up any of the things." The court found while trial counsel was very polite in his examination of the older victim, trial

counsel did inquire about key points. He questioned the older victim about whether Rachel had boyfriends over to her home during the time when Petitioner was deployed and whether anyone else took photographs of her. In response to trial counsel's questions, the older victim denied that Rachel would have boyfriends come to the house. She also denied that Rachel "took any of the photos." The older victim testified that she moved back to New Hampshire in 2012, that she continued to live with Rachel until 2016, and that she continued to have contact with Rachel "until her dad found out." She "denied talking with [Rachel] about the case." The court noted that trial counsel asked the older victim if she had been told that, if she testified against Petitioner, "the charges against [Rachel] would be dismissed," to which the victim responded, "There was nothing ever discussed about court."

The post-conviction court, quoting from the Judge Fishburn's report, noted "that the defense of child sex cases prove[s] to be particularly challenging for several reasons." The court discussed that the report went on to state, "More importantly, the State had possession of a trove of sexually explicit photographs which would only serve to heighten the already accepted credibility of [the older victim] and add to the emotional impact [the older victim's] story would have on a jury." Quoting from *Hellard v. State*, 629 S.W.2d 4, 9-10 (Tenn. 1982) (internal citations omitted), the post-conviction court stated:

> It cannot be said that incompetent representation has occurred merely because other lawyers, judging from hindsight, could have made a better choice of tactics. As former trial lawyers, we know that a criminal trial is a very dramatic, vibrant and tense contest involving many variables and that counsel must make quick and difficult decisions respecting strategy and tactics which appear proper at the time but which, later, may appear to others, or even to the trial lawyer himself, to have been ill considered.

The post-conviction court found that the assistance provided by trial counsel in his examination of the older victim was not ineffective. The court found this issue was without merit.

Concerning the claim that trial counsel was deficient in his cross-examination of Agent Christian (Issue 5), the post-conviction court found that trial counsel "brought to the attention of the jury that []Petitioner's face was not visible" in the photographs to identify Petitioner. The court found that, while Agent Christian's opinion identifying the penis as Petitioner's penis "might not have been the response that trial counsel had hoped to receive," the court "does not find the performance of defense counsel in this aspect of the case to be deficient to such an extent so as to have prejudiced the defense of []Petitioner based on the standards of *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)." The court

10

found that Petitioner failed to prove that trial counsel provided ineffective assistance of counsel and concluded this issue was without merit.

Concerning trial counsel's failure to ensure that a *Qualls* instruction was given to the jury (Issue 6), the post-conviction court found that "the photographs of the alleged criminal acts of [] Petitioner are 'non-generic evidence' and that the omission of a request by trial counsel for a jury instruction relating election of offenses would not constitute ineffective assistance of counsel." The court further found that there was not "a reasonable probability that the result of the trial would have been any different even if an 'election' instruction had been given." The court found this issue was without merit.

Concerning the claim that trial counsel was deficient in not seeking a new trial after he discovered the text messages between Rachel and the stepmother (Issue 7), the post-conviction court found that the older victim denied that Rachel "had sexually assaulted her and taken sexually explicit photographs of her." The court noted that the older victim "acknowledged that, after [Rachel] lost custody of her, she continued to visit [Rachel] secretly until her father found out[.]" The court found that the older victim denied that she and Rachel "discussed the criminal case" and denied that Rachel told her to "blame everything" on Petitioner so the charges against Rachel would be dismissed. The court concluded that Petitioner failed to prove that there was a reasonable probability that the result of the trial would have been any different if the text messages had been introduced as evidence. The court determined that Issue 7 was without merit.

The post-conviction court denied the petition, and Petitioner timely appeals.

## Analysis

On appeal, Petitioner raises three issues. He claims that he received ineffective assistance of counsel because trial counsel failed to effectively present a defense, failed to request the appropriate jury instruction under *Qualls*, 482 S.W.3d at 1, and failed to effectively request a new trial when he was made aware of text messages that demonstrated two witnesses in the trial allegedly committed perjury.[6]

The State argues that Petitioner abandoned the claim that trial counsel failed to effectively present a defense. The State also argues that the post-conviction court properly

---

[6] We determine that all other claims that were raised in Petitioner's post-conviction petition and asserted by Petitioner at the post-conviction hearing are waived. Tenn. R. App. P. 27(a)(7); *see Logan v. State*, No. M2018-01786-CCA-R3-PC, 2020 WL 918607, at *2 (Tenn. Crim. App. Feb. 26, 2020), *perm. app. denied* (Tenn. July 20, 2020).

determined that trial counsel was not deficient in failing to ensure that a *Qualls* instruction was given or failing request a new trial when he was made aware of the texts.

### *Effective Assistance of Counsel*

Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997); *Goad*, 938 S.W.2d at, 370 . Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### *Failure to Effectively Present a Defense*

The claim that trial counsel was ineffective because he failed to effectively present a defense was raised as an issue in Petitioner's pro se petition. Because that claim was neither specifically raised in nor incorporated into any of the four amended petitions, the State argues that Petitioner abandoned that issue. As a result of the trial counsel's failure to present a defense not being raised as an issue in the amended petitions, the post-conviction court did not address that issue, and we will not directly address that issue. *See Lane v. State*, 316 S.W.3d 555, 561-62 (Tenn. 2010) (Issues not raised in the post-conviction court will generally not be addressed on appeal).

However, in Petitioner's brief under the issue of trial counsel's failure to effectively present a defense, Petitioner addresses his claim raised in all five petitions that trial counsel rendered ineffective assistance in his cross-examinations of Agent Christian and the older victim. Trial counsel testified that he initially formulated a strategy based on suppressing hundreds of images extracted from the computer and hard drive discovered after law enforcement executed a search warrant at Petitioner's apartment. When the trial court denied the motion to suppress, counsel was forced to adopt a new strategy of trying to create doubt that the man whose penis, but not face, was shown in the images was Petitioner.

During cross-examination, trial counsel asked Agent Christian: "You don't know whose penis it is in those bathtub pictures, correct?" Agent Christian responded that it was his "assumption" that it was Petitioner's penis. Counsel said that, rather than object to the answer, counsel decided to emphasize that Agent Christian was only assuming the man in the images was Petitioner. Trial counsel testified that Agent Christian then gave a non-responsive answer stating that, based on comparison photographs, it was his opinion that the man was Petitioner. Trial counsel then asked Agent Christian questions emphasizing that Petitioner's face was not visible in the photographs. The post-conviction court determined that, while trial counsel "may have desired a different answer to the question, [the] court does not find the performance of defense counsel in this aspect of the case to be deficient to such an extent so as to have prejudiced the defense of []Petitioner[.]"

Concerning trial counsel's cross-examination of the older victim, the post-conviction court noted that the older victim identified an image showing herself nude and holding a male's penis and another photograph in which she is nude with her mouth in the groin area of a male she identifies as 'Carr[ie].'" The court found that trial counsel questioned the older victim about "the time when Petitioner was deployed," about whether

13

Rachel had boyfriends in her house, about whether she had contact with Rachel in New Hampshire, and whether Rachel took any of the photographs introduced at trial.

The post-conviction court stated in the Order Denying Post-Conviction Relief:

Often lawyers may reach the conclusion that other tactics, questions or approaches might have yielded a different result[;] this is not the standard in determining if a party was rendered ineffective assistance of counsel. [The] court does not find that trial counsel provided ineffective assistance of counsel in [its examination of the older victim], therefore this issue is found to be without merit.

The post-conviction court's findings of fact are "entitled to substantial deference on appeal unless the evidence preponderates against those findings." *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). The evidence does not preponderate against the post-conviction court's finding that trial counsel was not deficient in his questioning of Agent Christian or the older victim. More significantly, the evidence does not preponderate against the court's finding that, even if counsel's examination of Agent Christian was deficient, Petitioner failed to show that there was a reasonable probability that the jury's determination of guilt would have been different had such evidence been presented.

"[T]he fact that a particular strategy or tactic failed or even hurt the defense does not, alone, support a claim of ineffective assistance." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Petitioner has not demonstrated that any deficiency in the cross-examination of Agent Christian affected the outcome of the trial. In addition to the testimony of Agent Christian, the jury had the comparison photographs to assist in the identification of the man; Petitioner kept the images on his computer for years; and the older victim identified Petitioner in several photographs. We affirm the post-conviction court's conclusion that Petitioner failed to show that trial counsel was deficient in his examination of Agent Christian and the older victim or that he was prejudiced.

### *Qualls Jury Instruction*

In *Qualls*, our supreme court held that, "where a prosecution is based on such nonspecific or 'generic' evidence, requiring the prosecution to elect a single specific incident is not possible." *Qualls*, 482 S.W.3d at 2. In such situations, "the trial court must give a modified unanimity instruction which informs the jury that it must unanimously agree the defendant committed all the acts described by the victim in order to convict the defendant." *Id*.

14

The post-conviction court noted that counsel for the State and trial counsel agreed that, in consideration "of photographs which would be argued as representative of each count as alleged in the indictment," the *Qualls* instruction would not be given. Because such photographs were not generic, the State was able to elect a specific incident for each count of the indictment. We agree with the post-conviction court "that the omission of a request by trial counsel for a jury instruction relating election of offenses would not constitute ineffective assistance of counsel." We also agree with the court's finding that there was not a reasonable probability that the result of the trial would have been any different even if a *Qualls* instruction had been given. We find the issue without merit.

### *Motion for New Trial*

Petitioner claims that trial counsel was made aware of the text messages between the older victim and her stepmother before he filed the motion for new trial. According to Petitioner, the text messages show that the older victim was communicating with Rachel and that her stepmother was acting as an intermediary in arranging meetings. Petitioner argues that text messages showed that the older victim and her stepmother lied during their trial testimony about the communications. Petitioner claims that the older victim's credibility "was at the core of the case" and that trial counsel was ineffective by failing to raise this matter before the trial court.

The State argues that "[t]here is no indication of who sent the text messages or how they were printed out, so [P]etitioner would have been unable to lay a foundation" as to their authenticity. The State also argues that the older victim did not author the texts and that she testified at trial that she and Rachel had been in contact. The post-conviction court determined that the copies of the text messages were not authenticated, the text messages did not reference Petitioner, and the messages would not have affected the outcome of the trial. The evidence does not preponderate against the court's findings; accordingly, Petitioner is not entitled to post-conviction relief on this basis.

### <u>Conclusion</u>

We affirm the judgment denying post-conviction relief.

s/*Robert L. Holloway, Jr.*

ROBERT L. HOLLOWAY, JR., JUDGE

15